THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEPHEN CARTER, Defendant-Appellant.
First District (6th Division)   No. 1—91—0188

Opinion filed March 19, 1993.

8

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Margaret J. Faustmann, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a bench trial, defendant Stephen Carter was convicted of the first degree murder of Weldon Houston (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)) and was sentenced to a term of 30 years. On appeal, defendant contends that (1) he was denied a fair trial because the trial judge's rejection of his theories of justified use of force and second degree murder was based on two false premises; and (2) the Illinois murder statute (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1, 9—2) is unconstitutional because it violates principles of due process, equal protection, and separation of powers.

The relevant facts are as follows. Officer Nathan Silas testified for the State that at approximately 11 p.m. on August 11, 1988, he responded to a call of a man shot at 9200 South Langley in Chicago. When he arrived, he observed a large group of teenagers at the scene. He also saw a blue Yugo parked west of the group with the rear passenger window smashed out. Silas learned that the vehicle had belonged to the deceased. The deceased was lying in the grass in

a bloodstained shirt with blood coming from his head, the result of several gunshot wounds. Donnell Frazier was at the scene distraught, crying, and very upset.

Silas conducted a search of the scene and found no weapons. The streetlight at the scene was on when he arrived. He spoke to various witnesses, including Frazier. Afterwards, he and Frazier went to the home of Bruce Owens, who had been involved in the incident leading to the deceased's murder. When they arrived at Owens' house, Silas had a conversation with a man who identified himself as Owens, but who later turned out to be Jacques Michaud. Michaud gave Silas names and descriptions of various individuals which he passed on to other officers assigned to the case.

On cross-examination, Silas stated that the deceased was found lying on his back, but Silas did not know whether someone had rolled him over after the shooting. He also did not know whether the deceased possessed a gun at any time prior to being shot.

Detective Thomas Krippel testified for the State that after receiving information from other officers and from Frazier, he went to codefendant Gamel Bryant's home and arrested him. Bryant was later placed in a lineup where Frazier identified him. (Bryant was also convicted of the murder of the deceased, and his conviction was affirmed by this court. (*People v. Bryant* (1993), 241 Ill. App. 3d 1007).) Krippel later received a telephone call from defendant. Defendant wanted to know why the police had been to his home, and Krippel told him the police had been there in regard to a shooting. Defendant stated that he would present himself at the police station. When defendant arrived at the station, he was placed in a lineup where he was also identified by Frazier. He was advised of his constitutional rights and later submitted to questioning by Krippel and an assistant State's Attorney.

Michaud testified for the State that at approximately 10:30 p.m. on August 11, 1988, he left a restaurant and started riding his bike in the vicinity of 92nd and Langley when a young man, Marcus McCrane, called out to him. McCrane was standing on the northwest corner of the intersection with defendant, Bryant, and another young man. Bryant asked Michaud whether his belt buckle had anything to do with gang involvement, and he said no. Bryant swung at Michaud and Michaud ducked away. Michaud got off his bike and began wrestling with Bryant at which time defendant took Michaud's beeper. Michaud asked McCrane to "get his boys off of [him]." Michaud and Bryant continued to wrestle until they heard a siren. At that time, Bryant jumped off Michaud and started running.

Michaud left his bike and began walking north. He went to a pay phone and called Frazier, one of his best friends. Michaud asked Frazier to help him get his pager back. They decided to meet at Owens' house. Michaud admitted using Owens' name to identify himself to police officers, and stated that he did so because he had an outstanding traffic warrant and "didn't want to involve [his] name."

When Frazier arrived at Owens' house with a police officer after the shooting, he told Michaud that the deceased had been shot. Frazier described the persons who were involved, and on the basis of the descriptions, Michaud told the officer that defendant and Bryant were the gunmen.

On cross-examination, Michaud stated that he was not present when the deceased was shot. To his recollection, Bryant was not carrying a gun at the time he and Bryant wrestled.

Frazier testified for the State that on the evening in question he received a phone call from his friend Michaud. Frazier told Michaud that he would meet him at Owens' house. Frazier was riding his motorcycle to Owens' house when the deceased, a friend of Frazier's, called him over to a phone booth where he was on the phone. Frazier told the deceased where he was going, and they returned Frazier's motorcycle to his house and took the deceased's car.

On the way to Owens' house, Frazier and the deceased stopped to talk to Bryant at 92nd and Langley. Frazier asked him if he knew who had been fighting Michaud, and Bryant replied that he was the one. Frazier then told Bryant that the pager taken from Michaud was his. Bryant informed Frazier that the "Folks [the name of a gang] have the pager." He and Bryant walked up the street and turned the corner. The deceased followed them in his car. Frazier saw four or five men standing around and two or three sitting in a car. One of the men standing was defendant.

Bryant approached defendant and said, "[F]olks, give him that pager." Defendant gave Frazier the pager and tried to shake Frazier's hand and then threw up a gang signal. Frazier gave him a brief handshake but did not return the signal. Bryant became angry and said, "[Y]ou're not right, you're not right. I thought you were Folks." Frazier said, "I'm not Folks, and I'm too old for that." Bryant then said, "[W]ell, what the hell you doing coming around here if you're not Folks *** you'll get whoped like your boy." Frazier said, "[N]o, you're not going to whop me." Bryant then asked Frazier, "[Y]ou want to go with me?"

Frazier decided to fight Bryant because he would not be able to get away from the other men standing around. Frazier and Bryant

walked back around to Langley. Defendant followed them. The deceased backed his car around the corner to where Frazier and Bryant were headed. Bryant approached Frazier swinging, and the two fought. Frazier knocked Bryant down and then heard a gunshot. He heard more gunshots and turned to see defendant holding a gun, shooting the deceased from a distance of approximately 10 feet. Frazier heard four shots. He saw the deceased fall forward holding his stomach. He did not see a gun or anything else in the deceased's hands.

Frazier yelled to defendant, "[P]ut that up, put that up." Defendant froze momentarily, and Bryant ran toward defendant saying, "[G]ive me that gun, give me the gun." When Bryant reached defendant, Frazier ran, fearing that Bryant would shoot him. Bryant took the gun from defendant. While Frazier was running, he heard another gunshot. He turned around and saw Bryant standing near the deceased with his hands down holding a handgun. Frazier ran around a corner, and at this point heard one more gunshot. He turned back around the corner shortly thereafter and observed that the group of men, including defendant and Bryant, had gone. Frazier ran up to the deceased, who was lying facedown and bleeding as a result of being shot. He turned the deceased over and held him in his arms. The deceased was taken away by ambulance soon afterward. Frazier later observed that the rear passenger side window of the deceased's car was smashed out.

Subsequently, Frazier accompanied police officers to Owens' house, where Owens and Michaud were waiting. He told them that "they shot Weldon." Frazier identified "they" as "the guy that you [Michaud] was fighting and the guy that was with him," and he gave Michaud descriptions. The following day, Frazier viewed two lineups and identified Bryant in one lineup and defendant in the other.

On cross-examination, Frazier denied seeing a gun in the deceased's hand or seeing him point a gun at defendant. When questioned as to whether he actually saw defendant pull the trigger, Frazier stated that he saw defendant pointing the gun directly at the deceased from a close distance, and then saw the deceased going down. He saw Bryant take the gun from defendant, and at this point Frazier started running. He denied removing a gun from underneath the deceased after he had been shot.

Trent Smith testified for defendant that he was with defendant and Bryant the night of the shooting. Smith stated that a person approached him on the street, and Smith asked him about the belt buckle he was wearing. Bryant then stopped the individual and min-

utes later the two began wrestling. A beeper the individual was wearing fell off his belt, and defendant picked it up. Shortly thereafter, Bryant and the individual stopped fighting, and they departed in separate directions.

Twenty or thirty minutes later Bryant returned to the vicinity with Frazier, whose name Smith did not know. Smith, defendant and several others were standing around. Smith noticed a blue Yugo drive up at the same time Bryant arrived. Bryant approached defendant and asked for the beeper, which defendant gave to him. Bryant in turn gave the beeper to Frazier, and the two began arguing. Bryant and Frazier walked to a nearby corner, and Frazier hit Bryant. At the same time, the blue Yugo was backing up on a one-way street, Bryant and Frazier were exchanging blows. The deceased exited the Yugo carrying a gun and hit Bryant on the head. Smith shouted, "He got a pistol." The deceased turned to defendant and held the gun towards defendant's face from a distance of 5 or 10 feet. Defendant then pulled out a pistol and "shots started going off." Smith recalled that four or five shots were fired. The deceased fell forward on the gun and fell facedown on the grass.

Bryant ran towards defendant and took the gun out of his hand. He shot the gun one time at the back window of the Yugo, and then he and defendant ran. Smith saw Frazier run down the street and go around a corner. Frazier returned 20 to 30 minutes later with an individual named "Tuffy." Frazier turned the deceased over and picked up the gun the deceased had pointed at defendant. Frazier approached Tuffy with the gun, and "they had a discussion" and then left.

On cross-examination, Smith stated that he was a friend of Bryant and defendant and spent a lot of time with them. He was uncertain whether defendant and Bryant were part of a gang. Smith also never saw Frazier shake hands with defendant, nor did he see defendant attempt to flash a gang signal.

When questioned about the fight between Frazier and Bryant, Smith stated that after the deceased hit Bryant on the head with a gun, the deceased and Frazier started "rushing" Bryant. When asked about the gun, Smith was uncertain as to whether the "shiny" object the deceased was holding was in fact a gun. The deceased fired no shots. He never heard Frazier yell, "Put the gun up, put the gun up" or Bryant say to defendant, "Give me the gun." After defendant shot the first time, the deceased grabbed his waist and began to fall forward. He was falling as the other shots were fired.

Smith admitted that he never told police what he had seen that evening, and in fact the first time he gave his recollection of the events was at trial.

Erin Williams, nicknamed "Tuffy," testified for defendant that on the evening in question, he was sitting on his grandmother's porch when Frazier approached him in a hysterical condition. Frazier said that the deceased had been shot. He accompanied Frazier back to the scene of the shooting. While Williams waited in an alley, Frazier ran across the street to the deceased, who was lying facedown on the ground. He observed Frazier turn the body over onto his back and pick up a "shiny object" from underneath the body. Frazier returned to Williams and attempted to hand him a small-caliber handgun, but Williams refused. Williams ran back to his grandmother's house and told her to call the paramedics. At no time did Frazier tell Williams who shot the deceased. Williams never told the police that Frazier tried to give him a weapon on the night of the shooting.

Bryant testified that on the evening in question Frazier and the deceased pulled up in a small light blue car. Frazier exited the passenger side of the vehicle, approached Bryant and asked for his beeper. Bryant told Frazier he did not have it. Frazier asked Bryant if he was the one who had earlier fought with Michaud, and Bryant said he was. Bryant told Frazier where he could get his beeper, and they began walking down the street together. At the same time, the deceased was driving down the street. When they reached the corner, Bryant ran into a group of men, one of whom was defendant. Bryant asked defendant for the beeper, and when Bryant received it he turned it over to Frazier. The deceased told Frazier that they should leave, but Frazier said, "No, that's the guy who had a fight with [Michaud]; I'm fixin' to kick his ass." Bryant and Frazier walked to the corner and started exchanging punches.

The blue car backed around the corner, and the deceased came out. The deceased approached Bryant while he was still fighting with Frazier and hit him with a gun. Bryant fell to the ground and then heard several gunshots. Frazier began running, while Bryant arose, ran over to defendant, and took the gun. He ran across the street and shot once at the back window of the deceased's car. He then fled the scene, at some point throwing the gun into some bushes. Bryant stated that he did not fire any shots at the deceased.

On cross-examination, Bryant denied telling Frazier that "Folks got the beeper" or telling defendant and the others in the group, "Folks, give him the beeper." He admitted initially telling the police that he did not know who fired the shots.

Defendant testified that he picked up a telephone beeper from the ground while Bryant and Michaud were fighting. Later, when Bryant asked him to return the beeper, defendant retrieved it from McCrane and gave it to Bryant. Subsequently, defendant watched Bryant and Frazier fighting. He saw the deceased get out of his vehicle holding a silver handgun, and then he saw him hit Bryant in the face with it. At that point, Smith shouted that the deceased had a gun. Defendant stated that the deceased then "rushed over towards [him]" pointing the gun at him starting from a distance of 10 to 12 feet. Defendant twice told him to stop, but the deceased continued to move toward him. Defendant thought the deceased was "fixing to kill [him]." Defendant then pulled out his gun and fired it four or five times. He acknowledged that the deceased never fired a shot from any gun.

When questioned by police initially, defendant admitted telling them that the shots were fired from an unknown location by persons unknown to him and that after he heard the shots he ran down an alley with Bryant. He further admitted never telling police that he shot the deceased in self-defense. However, defendant did inform police that the deceased hit Bryant in the head with a .25 caliber automatic gun. Defendant confirmed that he and Bryant had discussed the case at various times up until the time of trial. Defendant denied telling Krippel that he was afraid of guns and owned none.

On rebuttal, Krippel testified that when Bryant was arrested the day following the shooting, he gave an oral statement to Krippel at which time he stated that some shots had been fired but he did not know from where or by whom. He did not tell Krippel that he fired any shots, although he was not directly asked that question. Krippel also testified as to an oral statement given by defendant in which defendant stated that he was afraid of guns and did not own any weapons.

Defendant's bench trial proceeded simultaneously with Bryant's jury trial. The trial court, rejecting defendant's claims of justified use of force and, alternatively, second degree murder, convicted him of first degree murder and sentenced him to a term of 30 years.

Defendant first contends that the trial court denied him a fair trial by rejecting his theories of justified use of force (self-defense) and second degree murder based on an unreasonable belief in self-defense on the basis of two false premises: (1) that he was impeached by his failure to tell police during questioning that the deceased was armed; and (2) that the State rebutted his claim of self-defense with the testimony of two eyewitnesses when, in fact, there was only one. Defendant argues that but for its erroneous belief in these two false

premises, the trial court would have either acquitted him or convicted him of the lesser offense of second degree murder.

A person is justified in using deadly force against another when he reasonably believes that such conduct is necessary to defend himself against such other's imminent use of deadly force (Ill. Rev. Stat. 1987, ch. 38, par. 7—1). Justified use of force, or self-defense, is an affirmative defense to first degree murder. A person commits the offense of second degree murder when he commits first degree murder and at the time of the killing believes the circumstances to be such that, if they existed, would justify or exonerate the killing, but such belief is unreasonable. Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(2).

At trial, defendant testified that the deceased, armed with a handgun, rushed towards him pointing the gun at him. According to defendant, he told the deceased twice to stop, but the deceased continued to approach him. He stated that he thought the deceased was going to kill him so he pulled out his gun and shot the deceased four or five times.

In determining whether defendant's claim of self-defense was merited, the trial court made the following pertinent comments:

> "[T]he very credible question that one has to ask is, *did this Defendant reasonably believe that Mr. Houston sas [sic] armed with a dangerous weapon and intended to do him bodily harm?* Or stated differently, is the placing of a gun in Mr. Houston's hands now an afterthought, or is that in fact what the Defendant reasonably believed?
>
> * * *
>
> The evidence in this case that tends to place a gun in Mr. Houston's hands comes from the Defendant and his witnesses at the first opportunity to proclaim that his conduct was *justifiable within the parameters of the law.* He fails to do so knowing full well that it was he who brought about the death of Mr. Houston. The law is [clear] that a person's credibility may be impeached by his failure to proclaim *that which one would expect he would proclaim when given an opportunity to do so*, is [sic] classic impeachment by omission which is just as strong, just as forceful, just as relevant as impeachment by a prior inconsistent statement.
>
> * * *
>
> *** [T]he time allowing one to compose one's self and to have the counsel of one's soul [to] be brought into a police facility and elect not to tell the police, *the only thing that could*

*make the conduct non-criminal* is, in my judgment, unexplained.

\* \* \*

So I find that this *Defendant has been impeached on the most crucial issue in this case* \* \* \*." (Emphasis added.) .

In rejecting defendant's self-defense claim, the trial court employed the rule of impeachment by omission. This rule permits the trier of fact to use prior silence to discredit a witness' testimony so long as the witness had an opportunity to make a statement or offer information, and under the circumstances a person would normally have done so. *People v. Conley* (1989), 187 Ill. App. 3d 234, 244, 543 N.E.2d 138, 145.

Defendant maintains that the quoted comments of the trial court indicate that the trial court found that his credibility was impeached by his failure to tell police that *the deceased possessed a gun at the time of the shooting.* Were we to accept this interpretation, we would have to agree with defendant that the trial court erred in so finding. Although the record reveals that defendant initially told police that the shots which killed the deceased were fired from an unknown location by people unknown to him, the record also reveals that defendant did eventually tell police that the deceased was holding a .25 caliber pistol and struck Bryant with it.

■ We cannot agree, however, with defendant's narrow interpretation of the trial court's comments. When their meaning is considered in the context of defendant's proffered claim of self-defense, we cannot logically conclude that the omission which the trial court found fatal was defendant's failure to tell police that the deceased had a gun. Rather, as the highlighted portions of the trial court's comments bear out, the trial court's real focus was on his failure to tell police that the deceased rushed towards him pointing the gun in such a way that he believed the deceased was going to kill him. It is readily apparent that the trial court was concentrating on these omitted details—the only details that would have justified defendant shooting the deceased—in determining that defendant's claim of self-defense was contrived. We agree with the trial court that defendant's failure to inform police of these critical details belies his claim, heard for the first time at trial, that he shot the deceased in self-defense.

Similarly, Smith's failure to inform police that defendant shot the deceased to protect himself further weakens defendant's claim of self-defense. Although the trial court did not focus on Smith's pretrial silence to discredit his testimony, his silence nevertheless buttresses the

trial court's conclusion that defendant's claim of self-defense was an "afterthought."

Defendant argues that he should not be faulted for failing to tell police that the deceased came after him with the gun because he was not "acquainted with the intricacies" of the law of self-defense and was afraid that he would be confessing to murder. However, defendant was advised of his right to remain silent and his right to speak to an attorney before questioning. Waiving those rights, he chose instead to give the police a statement describing what happened the night of the shooting. After initially telling police that the shots which killed the deceased were fired from an unknown location by unknown persons, he then stated that the deceased had a gun and hit Bryant with it. Knowing that he in fact shot the deceased, defendant nevertheless failed to tell police at the first opportunity that the deceased was the aggressor and that he shot the deceased only to protect himself. A reasonable person would have informed police of these critical circumstances. Defendant's contention, therefore, is without merit.

Defendant also argues that the trial court's rejection of his self-defense and second degree murder claims was tainted by an erroneous belief that the State's evidence included the testimony of two eyewitnesses. Upon reviewing the record, we agree with defendant that the trial court mistakenly believed that both Frazier and Michaud witnessed the shooting, when in fact only Frazier was present.

■ Notwithstanding the trial court's erroneous belief in this regard, we decline to find reversible error. There is no question that defendant killed the deceased and, for the reasons discussed, we believe that the trial court was justified in finding that defendant's claim of self-defense was contrived. Therefore, we uphold defendant's conviction for first degree murder.

■ Defendant finally contends that the Illinois murder statute (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1, 9—2) is unconstitutional because it violates principles of due process, equal protection, and separation of powers. This court has on numerous and recent occasions considered and rejected these specific challenges to the constitutionality of our murder statute. (See, *e.g., People v. Banks* (1992), 227 Ill. App. 3d 462, 592 N.E.2d 107; *People v. Johnson* (1992), 227 Ill. App. 3d 800, 592 N.E.2d 345; *People v. Smallwood* (1991), 224 Ill. App. 3d 393, 586 N.E.2d 636; *People v. Davis* (1991), 221 Ill. App. 3d 1023, 583 N.E.2d 64; *People v. Guidry* (1991), 220 Ill. App. 3d 406, 581 N.E.2d 38; *People v. Brown* (1991), 218 Ill. App. 3d 890, 578 N.E.2d 1168; *People v. Wright* (1991), 218 Ill. App. 3d 764, 578 N.E.2d 1090; *People v. Willis* (1991), 217 Ill. App. 3d 909, 577 N.E.2d 1215; *People*

*v. Gore* (1991), 212 Ill. App. 3d 984, 571 N.E.2d 1041; *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373.) We decline to diverge from this substantial body of established precedent. We continue to hold that the Illinois murder statute is constitutional.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.