THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LIONEL MYLES, Defendant-Appellant.

First District (6th Division)   No. 1—91—1477

Opinion filed January 28, 1994.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

On June 28, 1990, off-duty Chicago police officer John Martin was shot in the alley behind his home. Defendant Lionel Myles was arrested and charged with murder in connection with the shooting. Defendant waived his right to a jury and the case against him proceeded to a bench trial. At trial, defendant admitted shooting Martin, but argued that he acted in self-defense. At the close of trial, the court found defendant guilty of murder and sentenced him to serve a term of 35 years in the State penitentiary. Defendant now appeals both his conviction and sentence.

Defendant raises the following issues for our review: (1) whether the State disproved his claim of self-defense; (2) whether the trial court committed reversible error in convicting defendant of first-degree murder in light of mitigating evidence; (3) whether the trial court abused its discretion in allowing the State to reopen its case in order to establish *corpus delicti*; (4) whether the trial court abused its discretion in sentencing defendant to 35 years in the State penitentiary; and (5) whether the Illinois homicide statute violates State or Federal due process, separation of powers or equal protection principles.

The State's case against defendant was based principally upon the testimony of one of Martin's friends, Robert Pizarro. Pizarro testified that he was cleaning up debris behind his home when he observed defendant around his automobile. According to Pizarro, the

two exchanged words and eventually pushed up against one another. Pizarro testified that the defendant started screaming that he would be back and that Pizarro would "see what's going to happen."

Pizarro testified that he called Israel Cintron, Martin's roommate, but that Martin himself answered the phone. Pizarro said that he had known Martin for eight years, that he considered Martin to be like a brother and that he and Martin would exercise together. He also said that Martin would share meals with him and his girlfriend, Magdalia.

Pizarro asked if Martin could come down to the back and the two men met on Pizarro's back porch. Pizarro testified that Martin was not dressed in his police uniform but was in street clothing. Pizarro knew that Officer Martin carried his service revolver in his ankle holster when he was off duty and carried his shield inside his pocket fastened with a clip. Pizarro stated that he saw Martin had his shield with him, but that he was not sure whether Martin had the revolver at the time the two met downstairs. Pizarro explained what had just happened with the defendant.

Pizarro and Martin proceeded to walk outside, but defendant was not there. Pizarro then heard the sound of a bicycle chain and saw defendant approaching on a bike with a gun in his hand. Pizarro testified that he turned to Officer Martin and said, "Johnny, that's the guy. He's got a gun." Pizarro said that defendant was smiling as he approached them. According to Pizarro, defendant rode up and put his bike tires right between Martin's legs. Pizarro testified that defendant smiled, pointed the gun at Martin's chest and fired without pausing. Pizarro also testified that, at the same time, Martin struck defendant with a right punch that landed on the left side of defendant's face.

Immediately after defendant shot Martin, Pizarro testified, defendant pointed the gun at him. Pizarro ducked and heard the gun click, but there was no explosion. Defendant then fled the scene on the bicycle.

Pizarro, who was also known to Martin as "Rico," testified that after Martin had been shot, Martin reached for his weapon in his ankle holster, took a few steps and fired twice toward defendant. Pizarro approached Martin, Martin passed Pizarro the weapon and said, "Rico, get him and don't let me die." Pizarro chased defendant down the alley and fired once as defendant fled.

When Pizarro turned to check on Martin, Martin was on the ground. Martin's eyes were open, but he could not talk and looked like he was in shock. Pizarro's girlfriend and Israel Cintron arrived on the scene and Pizarro told them what had happened. Eventually

the police arrived. Pizarro was leaning against a garage door still holding Martin's gun.

Pizarro stated that an officer kept asking him what had happened. Pizarro said he told the police officer that a black man on a 10-speed had shot Martin. The officer appeared excited and there were people in the back screaming. Pizarro denied telling the officer that a white man had shot Martin.

On cross-examination, Pizarro insisted that he did not tell the officer that the offender was a white man on a motorbike. Pizarro said he learned from someone months later that a police officer had written a report indicating that the offender was a white man but that he was still too emotional about the shooting to call and ask that the report be corrected.

On redirect, Pizarro stated that his right arm was in a cast from his fingertips to nearly his shoulder at the time Martin was shot. Pizarro stated that he fired the gun with his left hand.

Pizarro, in response to questions from the trial court, testified that neither he nor Officer Martin had any type of weapon in their hands when defendant rode up on his bike. Pizarro stated that Martin struck defendant in the face after defendant had shot Martin. As defendant began to flee, Martin picked up his weapon, took a few steps, stopped in pain and fired two shots before turning the gun over to Pizarro.

The defendant's girlfriend, Diane Russell, testified that she was defendant's fiancee and had known him for 14 years. They had two daughters. She testified that on the night Martin was shot defendant returned home from work looking mad. Russell said that it looked as if he had been hit because his clothes were off his shoulders. Defendant asked Russell where "it" was. She stated that she did not know what "it" was but that she assumed defendant meant the gun. She directed him to the bedroom. Defendant was in the apartment for 5 or 10 minutes. She stated that she did not pay much attention to defendant and that she turned to finish washing dishes.

When defendant next returned to the house, Russell stated that he looked the same and that he told her to get rid of "it." Russell assumed he was again referring to the gun and said that she found it on the couch. Defendant did not explain why he wanted her to get rid of the gun, but she put it in her purse, walked down the back alley and put the gun in a garbage can. Later, Russell showed police officers where the gun was located. Russell testified that defendant owned two bicycles which he kept in the apartment.

Israel Cintron, Martin's roommate, testified that on June 28, 1990, he and Martin were at home and Martin went downstairs

around 6 p.m. Cintron heard a gunshot, and then heard Martin call Cintron's name and was told by Martin to call the police. When Cintron went out on the porch, he saw Pizarro chasing a man on a bike. After Cintron called the police and went downstairs, he saw Magdalia Galarza comforting Martin, who was bleeding. The alley was chaotic from all the people screaming and yelling.

On cross-examination, Cintron testified that Martin wore an ankle holster but that the holster was not visible the day he was killed because his sweat pants covered it. Cintron stated that he did not see Martin fire the second, third or fourth shots, but saw him on the ground after the first shot.

In response to the trial court's questions, Cintron said he was on the phone with the police when the other shots were fired. He went outside and saw Pizarro kneeling against the garage. Pizarro was crying.

Magdalia Galarza testified that she lived with Robert Pizarro. On June 28, 1990, she heard one soft gunshot, then one loud gunshot, ran outside and saw Martin coming toward her until he fell on top of her. Galarza put Martin on the ground and heard a third gunshot and saw Pizarro coming toward her. Pizarro said, "[a] black man on a bike, how is Johnny?" Galarza also said that she put Martin's head on her knees and told him to breathe. Pizarro was banging his head on the garage saying "Johnny, no. God, no. Breathe." Several people were yelling, "Johnny, breathe." There was a lot of commotion and everyone was hysterical. One police officer arrived, pointed his gun at Pizarro and told him to drop the gun. Pizarro was slouched against the garage still holding a gun. Everyone yelled to the police officer that Pizarro was not the man who had shot Martin, but the officer said he did not care. The officer told everyone to move back and ordered Pizarro to "[d]rop the fucking gun." Pizarro dropped the gun after everyone yelled at him to do so.

On cross-examination, Galarza stated that Pizarro sometimes swept the garage but not on a regular basis. She did not know if Pizarro cleaned up debris in the alley.

Ann Manikas testified that she can see the alley from her office where she was working when Officer Martin was shot. On that evening Manikas heard a popping sound, then she heard about four more popping sounds, but she was unsure of the exact number. When Manikas looked out the window she saw a man in navy staggering and then he fell. Manikas saw a woman's legs kneeling next to the man. The woman ran out and was screaming. Manikas then saw another man with a gun who had a cast. Manikas never saw anyone on a bike.

On cross-examination, Manikas testified that she did not see a white man in the alley with a gun in his hand. She talked to police soon after she went downstairs and told them the man she saw with a gun was Hispanic.

Donald Bonville, a maintenance repairman working nearby, testified that he heard loud voices. Bonville saw a man with a cast on his arm chasing a slender black man. At one point the larger man appeared to bend over "like he was going to pick up a rock or brick." The man picked something up but did not throw it. The other man "took off." Bonville never heard any shots fired. Bonville never saw a third person involved in the argument.

On cross-examination, Bonville testified that he never saw the slim man strike or grab the bigger man. Bonville stated he heard shots but it may have been 30 minutes later. He stated that he was not sure of the exact length of time that had passed.

Jonathan Locke, who also was nearby, testified that he was outside in front of his apartment on June 28, 1990, when he saw a black man with black clothes riding on a bike on the sidewalk. Locke had seen the man before but did not know his name. He testified that the man lived next door to him. Locke identified defendant as the man on the bike. He stated that defendant rode the bike really fast, crashed into the gate and kept going like he was running from someone.

Sean Flyr testified that he was walking south on Sheffield on June 28, when defendant, who was on a mountain bike, came from behind and swerved around him, headed south. Soon thereafter, Flyr heard several loud bangs which he imagined were gunshots. Flyr saw defendant on the bike place something under his jacket. Defendant then headed north.

Officer Peter Magnine testified that he investigated Martin's death by assisting in the canvassing of the area. After information was developed, Magnine arrived at defendant's home. He stated that, at the time, he saw two men sitting on the top of the stairs. When Magnine approached the two men, he noticed the door was open and saw bikes inside. Magnine arrested defendant and took defendant to the police station.

Defendant stipulated to the qualification of Dr. Robert Kirschner. Kirschner testified he performed autopsy number 582 on a 31 year-old, 5-foot seven-inch, 166-pound black man in June 1990. That victim died from a single gunshot wound to the chest. The contact wound showed charring and gunpowder residue and soot along the wound track through the chest wall and breastbone. The bullet penetrated the right side of the heart and lung and lodged in the back.

In addition to his stipulation, Dr. Kirschner testified as part of the State's case. He stated that the weapon used to kill the subject of the autopsy must have been in contact with him when fired. Dr. Kirschner testified that it was not inconsistent for a person to receive this type of wound and still be conscious and perform various tasks. Dr. Kirschner stated that heart wounds may bleed slowly and a person could be conscious and engage in conscious activities for minutes afterwards. Dr. Kirschner testified that it was possible that a person could have taken a few steps and fired a weapon before losing consciousness and dying.

In response to the trial court's question, Dr. Kirschner testified that the injuries sustained by his patient were not inconsistent with his being able, following the injury, to strike defendant in the face, fall to the ground, reach for his ankle holster, pull out his gun, stand up, take a few steps, fire two shots, hand the gun to a third person and say, "Don't let me die."

It was stipulated that Dr. Fantus, if called, would testify that he was a doctor at Illinois Masonic Hospital and while performing surgery on a patient named Johnny Martin to remove a bullet from his chest, Martin died at 9:01 p.m. on June 28, 1990.

It was further stipulated that the chain of evidence on all exhibits before the court and upon Martin's body was proper. It was also stipulated that if Earnest N. Warner were called, he would testify that he is a crime laboratory ballistics expert for the Chicago police department and that the bullet recovered from the medical examiner's office and People's exhibit No. 34 (the gun recovered from the trash can near defendant's home) shared consistent class characteristics.

The State rested and defendant made a motion for a finding based upon witness discrepancies and upon the fact that the State had failed to show that the body examined by the medical examiner's office was, in fact, Martin. Defendant's counsel, in arguing the motion, noted that there had been no life and death witness and argued that the identity of names between the person who was treated by Dr. Fantus at Illinois Masonic Hospital and the victim was insufficient. The State responded that defendant had stipulated to the chain of custody over the body and that defendant's argument was "specious." The trial court indicated that the State's Attorney "quite obviously" believed that there had been a stipulation covering the fact that the man who was shot was the man who died at Illinois Masonic. The trial court, *sua sponte*, granted the State leave to reopen its case. Defendant's counsel then agreed to stipulate that, if called, Dr. Kirschner would testify that the picture of Officer Martin in uniform

was the same man who was the subject of autopsy number 582. It was also stipulated that, if presented, Dr. Fantus would identify that same picture as being of the man whom he pronounced dead at 9:01 p.m. on June 28, 1990.

Defendant's renewed motion for a directed finding based upon witness inconsistency was denied.

The defendant then presented his case. It was first stipulated that, if called, Detective Thomas Johnson would testify that his police report showed that Ann Manikas had told him that she saw a white man with a yellow hat walking through the alley with a gun in his hand.

Officer Hatzel next testified that he was patrolling the area around Belmont and Sheffield on June 28, 1990, when he responded to a call regarding a shooting. The victim was Chicago police officer Johnny Martin. Hatzel stated that he ordered Pizarro five or six times to put his weapon down, then Pizarro told him about the shooting. Pizarro told Hatzel that a white man on a motorbike shot Martin.

On cross-examination, Hatzel testified that when he arrived at the crime scene there were three to four women and what seemed "like a zillion kids" in the area. Hatzel stated that it appeared that when he ordered Pizarro to drop the gun, Pizarro did not understand his request because it took him 5 to 10 seconds to respond. Pizarro was stammering, trying to get words out of his mouth but was unable to speak due to the shock of the situation.

Initially, Pizarro said that the offender was a white man on a motorbike, but within 15 to 30 seconds Hatzel said Pizarro told him that the offender was a black man on a 10-speed bike. Hatzel testified that there was a lot of screaming at the scene and that even he was excited and shaken, especially after having almost shot Pizarro. Hatzel checked the gun Pizarro dropped and found that it had three spent shells.

Defendant testified that several minutes before he shot Martin, Pizarro and a black man who may or may not have been Martin had spoken with him in the alley. He stated that he did not threaten either man with words or gestures but that Pizarro eventually took a board and hit him over the head with it. He said that he stumbled and ran home. Defendant stated that he wanted to find out why he had been hit and took a gun with him for protection. He asked his wife when he got home where "it" was. He admitted he was angry, but insisted that he did not intend to shoot anyone. He said he carried the gun in his waist and under his jacket.

Defendant testified that when he returned to the area, he

intended to ask the two men why he had been hit with the board and said that he was concerned because he had to return through the alley the next morning on his way to work. Before he could ask the question, however, Martin reached down and hit him in the face. He said he simultaneously heard a gunshot. Defendant stated he did not pull out his gun until Martin bent down and that he was in the alley for about 45 seconds before he fired. Defendant stated that he never threatened either Martin or Pizarro before he was struck in the face.

Defendant said that when he shot Martin he was scared for his life. He said that he shot Martin because Martin had hit him in the face. About 20 seconds after firing his gun, defendant stated he heard three or four shots and he stated that he saw Pizarro firing a gun.

Defendant testified that he told his fiancee to get rid of the gun because he was scared, the gun was not registered and he did not know what was happening.

On cross-examination, defendant admitted that he intended to shoot Martin. Defendant stated that he had three or four beers on his way home from work around 3 p.m. When defendant was going home and walking through the alley, the black man and Pizarro were behind the truck with the hatch open. Defendant asked the two men, "What's up? I want to ask you a question." Pizarro said, "Get the fuck on." Defendant was looking at Pizarro and walking away at the same time when Pizarro went over to pick something up. Defendant did not notice the cast on Pizarro's arm. Defendant testified that he was struck in the back of the head but that he did not know exactly where. He heard something crack, either his head or the board.

Defendant stated that Martin's blow to his face resulted in puffiness below his left eye. Defendant testified that the puffiness was larger than what a picture shown to him depicted because when he was at his house he put ice on his face and his eye may have been less swollen the next day.

It was stipulated that attorney Leo Fox, if called, would testify that he appeared on behalf of defendant on June 30, 1990, in holiday court. Fox saw defendant in the bullpen area, noticed a nickel-sized discoloration under defendant's eye and pointed it out to the judge. Fox would further testify that Pizarro's jeep was dusted for prints, but that those tests were inconclusive.

The State, in rebuttal, presented the testimony of police officer Thomas Johnson. He testified that he interviewed defendant in Area Six on June 28, 1990, at around 11:30 p.m. Defendant told Johnson that when he arrived back at the location with Pizarro and Martin, Pizarro fired five or six shots at him, then he pulled his gun and fired

one shot at one of the men. Defendant never told Johnson that Martin pulled his weapon from his ankle holster, raised it and hit him in the face with it.

Assistant State's Attorney Kevin Sheehan testified that he talked to defendant at Area Six after explaining his function to defendant and after reading defendant his rights. Sheehan said he did not notice any marks on defendant's face. Defendant told Sheehan he had an initial confrontation with two men in an alley and defendant was hit on the head when the larger man broke a 2 by 4 over his head. Sheehan felt the back of defendant's head but did not feel or see any injury.

According to Sheehan, defendant never told Sheehan that the first two men were not the same two men that were there when defendant returned to the scene. Defendant told Sheehan that he returned with a gun in his waist to confront the men about why they hit him in the head with a 2 by 4 when one of the men pulled a gun and fired at him a number of times. Defendant did not tell Sheehan that Martin hit him in the face while the gun discharged. Sheehan stated that defendant never complained of any physical injuries.

Following the State's rebuttal and closing arguments the court found defendant guilty of first-degree murder. The judge specifically stated that he did not believe that Officer Martin ever struck defendant and did not believe any of Pizarro's testimony to be inconsistent. The judge stated he believed that defendant rode his bike up to Officer Martin and fired his gun at Martin's chest at close range. The judge also stated that he believed Martin's death was the result of a "sick society that permits readily accessible handguns to mix with readily accessible drugs and alcohol."

Defendant testified at his sentencing hearing. Defendant, who was then 32 years old, stated that he had worked most of his life since he was 18 or 19 and had been employed at the time of the murder. He stated that he had attended various trade schools to make himself more marketable. He admitted having been arrested for marijuana possession. He stated that he was very sorry for what had happened and the grief he had caused both Martin's family and his own.

Diane Russell testified that she and defendant had lived together for nine years. They had two children who lived with them. Russell stated that defendant would contribute his earnings to his family and help with the kids.

Sister Miriam Wilson, a chaplain at the Cook County jail, testified that she had seen defendant on a regular basis during the course of the year as defendant waited for trial. Wilson testified that defen-

dant was very gentle and had been a positive presence in the jail, which she described as a "hostile environment." She stated that she spoke often with defendant's wife and children. Sister Wilson concluded that she did not believe defendant would be a threat to society.

Following argument, the court sentenced defendant to a term of 35 years in the penitentiary.

OPINION

Defendant first argues that the State failed to disprove that he shot Officer Martin in self-defense. In Illinois a defendant who raises a claim of self-defense must offer some evidence to the trial court that each of the following elements existed at the time he or she acted: (1) force had been threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm was imminent; (4) the force threatened against defendant was unlawful; (5) defendant had an actual belief (a) that a danger existed, (b) that force was necessary to avert the danger, and (c) that the amount of force used was necessary; and (6) that defendant's beliefs were reasonable. (*People v. Huddleston* (1993), 243 Ill. App. 3d 1012, 614 N.E.2d 86; *People v. Willis* (1991), 217 Ill. App. 3d 909, 917, 577 N.E.2d 1215. See also Ill. Rev. Stat. 1989, ch. 38, par. 7—1 (now codified, as amended, at 720 ILCS 5/7—1 (West 1992)).) Once the defendant raises the issue of self-defense and introduces some evidence as to each of these elements, the burden shifts to the State to prove that the defendant did not act in self-defense. The State meets this burden by affirmatively disproving at least one of the above elements beyond a reasonable doubt. *People v. Murillo* (1992), 225 Ill. App. 3d 286, 292, 587 N.E.2d 1199; *Willis*, 217 Ill. App. 3d at 917-18.

In this case there were sufficient facts before the trial court to require the State to meet the burden of disproving self-defense. Defendant testified that he had been hit over the head with a board by Pizarro and that he returned to the scene only to speak with him about the incident. He stated that when he arrived Officer Martin struck him in the face with an object and that he heard a gunshot. He stated that at this point he raised his gun and fired. It was established that Officer Martin was armed with his service revolver at the time of the killing, and defendant stated that at the time he acted he was in fear for his life. While the State argues that defendant's testimony was not credible and that it was not necessary for it to have disproven defendant's self-defense claim, it is clear that the credibility of defendant's claims are a matter for the trial court. *People v. Felella* (1989), 131 Ill. 2d 525, 533, 546 N.E.2d 492; *Hud-*

*dleston*, 243 Ill. App. 3d at 1019, quoting *People v. Sutherland* (1992), 155 Ill. 2d 1, 17, 610 N.E.2d 1; *People v. Willis* (1991), 217 Ill. App. 3d 909, 918, 577 N.E.2d 1215.

Defendant does not complain, however, that he was denied the opportunity to argue his self-defense theory at trial. Instead, he claims that the trial court committed reversible error in believing Pizarro's version of events. When the appellate court reviews such a determination, all of the evidence must be viewed in the light most favorable to the prosecution. (*Sutherland*, 155 Ill. 2d at 17.) "This standard of review does not allow the appellate court to 'substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of witnesses.' " (*Sutherland*, 155 Ill. 2d at 17, quoting *People v. Campbell* (1992), 146 Ill. 2d 363, 375, 386 N.E.2d 1261.) We will not set aside a conviction on review unless the evidence is so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Campbell*, 146 Ill. 2d at 375; see also *People v. Williams* (1993), 246 Ill. App. 3d 1025, 617 N.E.2d 87.

■ In this case the State presented more than sufficient evidence for the trial court to have rejected defendant's self-defense claim *beyond a reasonable doubt*. Pizarro testified that defendant approached the scene with a gun in his hand and rode directly up to Martin, placing a gun at Martin's chest. Pizarro testified that the two did not initially struggle but that defendant simply smiled and pulled the trigger. Pizarro testified that it was only after defendant shot that Officer Martin struck him in the face. Dr. Kirschner testified that the type of injury suffered by Officer Martin was not inconsistent with Pizarro's description of Martin's actions after being shot.

Nonetheless, defendant argues that Pizarro's testimony is inconsistent and that he should have been acquitted because none of the other evidence disproves his self-defense claim. He points to the following: (1) Pizarro initially indicated that the man who shot Martin was a white man on a motorcycle; (2) Pizarro claimed that he heard defendant approaching on the bicycle, yet witnesses Locke and Flyr failed to indicate that they heard the bike; (3) Pizarro's girlfriend, Magdalia, testified that Pizarro did not always clean up debris in the back, while Pizarro testified that he cleaned up debris every week; (4) Pizarro did not testify that he chased defendant following their first encounter, yet witness Bonville stated he saw an Hispanic man chasing defendant away from the scene and that the Hispanic man picked up something as if preparing to hurl it at the man whom he was chasing; and (5) Pizarro indicated that neither Pizarro nor Martin took cover after Pizarro cried out that defendant

was approaching with a gun in his hands, so that Pizarro's version of events required the fact finder to believe that Martin, a trained police officer, failed to take immediate action.

While defendant argues that Pizarro's testimony is inconsistent, we believe these "inconsistencies" to be of a minor nature and certainly collateral to the issue of whether defendant killed Martin in self-defense. (See *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402 (minor inconsistencies in the testimony of the witnesses do not of themselves create a reasonable doubt as to the defendant's guilt).) It is well established that the trier of fact is in the best position to assess the credibility of witnesses, determine the weight to be accorded their testimony, decide what inferences to draw from the evidence, and resolve any factual disputes arising from conflicting or inconsistent testimony. (*People v. Hendricks* (1990), 137 Ill. 2d 31, 65, 560 N.E.2d 611; *People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174; *People v. Grengler* (1993), 247 Ill. App. 3d 1006, 617 N.E.2d 486.) In this case the State's evidence was more than sufficient to disprove self-defense if the court believed Pizarro's testimony. We do not believe Pizarro's testimony was so contradictory and improbable as to require reversal. (*Cf. People v. Hister* (1975), 60 Ill. 2d 567, 328 N.E.2d 531; *People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96.) We therefore conclude that the trial court reasonably rejected defendant's claim.

Defendant next argues that the trial court improperly convicted him of first-degree murder and that the evidence warrants only a conviction for second-degree murder. Under section 9—2 of the Criminal Code, once the State has proven the elements of first-degree murder beyond a reasonable doubt, the defendant may reduce the offense to second-degree murder by showing by a preponderance of the evidence that his actions were the result of an actual, but unreasonable belief that he was acting in self-defense. (See Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2) (now codified, as amended, at 720 ILCS 5/9—2(a)(2) (West 1992)).) In the alternative, defendant may show that he acted out of a sudden and intense passion. Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(1); 720 ILCS 5/9—2(a)(1) (West 1992).

■ Defendant argues that, "at a minimum," the evidence shows that he unreasonably believed he was acting in self-defense when he shot and killed Martin. Such a conclusion, however, is directly contrary to the trial court's findings. Defendant's brief proceeds as if the trial court were required to believe defendant's testimony that he shot while in fear of his life. The trial court specifically found, however, that defendant's motivation in shooting Officer Martin was not because he was being attacked by Martin, but instead, because of the "verbal altercation" which defendant had earlier with Pizarro.

Defendant also directs us to comments made by the trial judge at sentencing and argues that these comments require us to vacate his conviction for first-degree murder. During sentencing the trial judge stated that he believed defendant's conduct was a "chemically augmented over-reaction to a social unpleasantry." Defendant notes that Webster's defines "overreaction" as "to react excessively or too strongly." He claims that it is inconsistent to find defendant "over-reacted" and not also find defendant guilty of second-degree murder, rather than first-degree murder.

Defendant's argument overlooks the express language of the second-degree murder statute which states that a defendant commits second-degree murder when he or she acts with a "*sudden* and *intense* passion resulting from *serious* provocation." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(1) (now codified, as amended, at 720 ILCS 5/9—2(a)(1) (West 1992)).) This is not proved by simply showing that the defendant "over-reacted." Obviously, when a defendant kills in reaction to a passion that is not sudden or not intense or when a defendant kills in response to a provocation that is not serious, that defendant has not committed second-degree murder. There is simply nothing inconsistent with the court saying that defendant "over-reacted," and simultaneously finding him guilty of first-degree murder.

Defendant next argues that the trial court impermissibly allowed the State to reopen its case in order to offer direct testimony of *corpus delicti*. The *corpus delicti* of the crime of murder consists of two essential elements which must be proved by the State. These elements are (1) the fact of death, and (2) the fact that the death was produced by the criminal agency of some person. (*People v. Holmes* (1977), 67 Ill. 2d 236, 367 N.E.2d 663; *People v. Melquist* (1962), 26 Ill. 2d 22, 28, 185 N.E.2d 825.) Defendant contends that the State initially failed to establish the *corpus delicti* necessary to convict him on a charge of murder because there was no direct evidence that the man who underwent surgery at Illinois Masonic Hospital was the same man defendant shot near the intersection of Sheffield and Belmont. Defendant argues that it was reversible error for the trial court to have allowed the State to reopen its case.

■ We think, however, that the defendant's argument proceeds from a faulty premise. While it is clear that the prosecution must establish the *corpus delicti* beyond a reasonable doubt, it is also clear that this may be done circumstantially. (*People v. Kennedy* (1986), 150 Ill. App. 3d 319, 501 N.E.2d 1004; *People v. Guthrie* (1980), 85 Ill. App. 3d 831, 834, 407 N.E.2d 593.) We note that the trial court did not find that *corpus delicti* was unproven; rather, the court indicated

simply that it would allow the State to reopen its case so that direct evidence of *corpus delicti* could be taken. While defendant infers from this that the court did not believe *corpus delicti* had been proven, we think it just as likely that the court decided to allow the State to reopen its case merely for the purposes of clarifying the record.

Our review of the record, however, leads us to the conclusion that the State had proved a sufficient *corpus delicti* even before the court allowed the State to reopen its case. *(Cf. People v. Whitfield* (1991), 214 Ill. App. 3d 446, 573 N.E.2d 1267.) We note that, following the State's case in chief, the State had established that "Johnny Martin" had been shot once in the chest by defendant near the intersection of Sheffield and Belmont. It was also established that a man named "Johnny Martin" underwent surgery at Illinois Masonic Hospital for treatment of a gunshot wound to the chest approximately three hours later. This man died from his injury. We take judicial notice that Illinois Masonic Hospital is located at 836 W. Wellington, just a few city blocks from the corner of Sheffield and Belmont. *(Cf. Northwestern Memorial Foundation v. Johnson* (1986), 141 Ill. App. 3d 309, 490 N.E.2d 161 (where the court took judicial notice that Northwestern Memorial Hospital was located in a densely populated urban area).) Under these facts we think it clear, beyond a reasonable doubt, that the man who died at Illinois Masonic Hospital was the same man who had been shot by the defendant. While it is possible two different men named Johnny Martin each suffered a gunshot wound to the chest on the same night and in the same general area of the city, we think the likelihood of such a coincidence to be remote.

Even assuming that *corpus delicti* had not been proven by the defendant, however, we would find no error in the trial court's conduct. Illinois law generally recognizes the power of a trial court to allow a litigant to reopen his or her case in an appropriate circumstance. *(People v. Cross* (1968), 40 Ill. 2d 85, 237 N.E.2d 437; *People v. Benoit* (1992), 240 Ill. App. 3d 185, 608 N.E.2d 250; *People v. Johnson* (1988), 173 Ill. App. 3d 998, 527 N.E.2d 1317.) The exercise of such discretion will not be reversed absent a clear showing of abuse. *(Cross,* 40 Ill. 2d at 90; *Benoit,* 240 Ill. App. 3d at 189; *Johnson,* 173 Ill. App. 3d at 1012.) Even after the State has rested its case, the court has the power to allow a party to put on additional evidence, even when this evidence is offered to " 'establish the very facts essential for a conviction.' " *People v. Padfield* (1974), 16 Ill. App. 3d 1011, 1015, 307 N.E.2d 183, quoting *People v. Price* (1972), 8 Ill. App. 3d 158, 160, 289 N.E.2d 280. See also *In re J.B.* (1983), 120 Ill. App. 3d 155, 457 N.E.2d

983 (*dicta* indicating that it would have been proper for a trial court to have allowed the State to reopen its case in order to establish *corpus delicti*).

Defendant next contends that 35 years' imprisonment is an excessive sentence. He concedes, however, that he was sentenced within the statutory guidelines for murder which mandate a prison term of between 20 and 60 years. Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1 (now codified, as amended, at 730 ILCS 5/5—8—1 (West 1992)).

Defendant argues that comments by the trial court indicate that the court considered facts in sentencing which are unsupported by the record. Specifically, defendant complains that the court indicated that he had a "high involvement" with guns. Defendant also complains that the court improperly increased his sentence by considering his alcohol consumption just prior to and immediately following the shooting even though there is no direct evidence that defendant was influenced by alcohol.

■ We agree that there is no evidence, beyond defendant's own irrational conduct, to show that defendant was under the influence of alcohol at the time he murdered Officer Martin. We also agree with defendant's argument that simply because he referred to the murder weapon as "it" does not *necessarily* indicate a "high involvement" with guns. When determining whether a sentence was improperly imposed, however, a reviewing court must not focus on a few words or statements made by the trial court. The determination of whether or not a sentence was improper must be made by considering the record as a whole. (*People v. Ward* (1986), 113 Ill. 2d 516, 526-27, 499 N.E.2d 422.) We have carefully reviewed the record. We note that the trial court properly evaluated the factors set out in the sentencing hearing guidelines in the Unified Code of Corrections. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—4—1 (now codified, as amended, at 720 ILCS 5/5—4—1 (West 1992)).) We do not believe the court's comments can be said to have resulted in an inappropriate sentence based upon the facts presented.

We also reject defendant's claim that the trial court failed to properly consider his rehabilitative potential. The record indicates that the trial court specifically noted that defendant had a minimal prior record and had the potential for rehabilitation. The court also stated that he had considered Sister Wilson's testimony regarding defendant's conduct in prison prior to trial but that he believed the need to protect society and to enforce the law outweighed these considerations. It is the trial court's task to fashion a sentence which strikes the proper balance between the protection of society and re-

habilitation of the defendant. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) We cannot say that the court improperly balanced these competing interests here.

■ Finally, defendant argues that the Illinois homicide statute is unconstitutional. As defendant himself concedes, however, the issues raised in his brief have been fully addressed by prior appellate court opinions. (*People v. Carter* (1993), 245 Ill. App. 3d 7, 614 N.E.2d 167; *People v. Gore* (1991), 212 Ill. App. 3d 984, 571 N.E.2d 1041; *People v. Manley* (1991), 222 Ill. App. 3d 896, 584 N.E.2d 477.) Because this court addressed the arguments raised by the defendant in prior decisions, we summarily reject defendant's arguments.

For the foregoing reasons, defendant's conviction for first-degree murder and his sentencing for that crime are affirmed.

Affirmed.

EGAN, P.J., and RAKOWSKI, J., concur.