FOURTH DIVISION

MAY 13, 2004

1-02-2050

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the 

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) 

)

JOHNNY MARTINEZ, ) Honorable

) Marcus R. Salone,

Defendant-Appellant. ) Judge Presiding.

JUSTICE HARTMAN delivered the modified opinion of the court upon denial of rehearing:

Following a bench trial, defendant, Johnny Martinez, was convicted of first degree murder and sentenced to 25 years' incarceration for his participation in the fatal gang-related group beating of the victim, Daniel Garcia.  On appeal, defendant raises several issues, including whether:
 (1) the State proved him guilty of first degree murder beyond a reasonable doubt; (2) the circuit court erred in admitting in evidence a key eyewitness' prior inconsistent statement; (3) the court erred in admitting in evidence his written statement; and (4) he received effective assistance of counsel.

Defendant proceeded by way of a bench trial.
(footnote: 1)  At trial, the following evidence was heard by the court.  Daniel Garcia died after being beaten by defendant, his codefendants, and others.  One or two days before Garcia was beaten, Manuel Rodriguez had driven Garcia to the area of Armitage Avenue and Whipple Street in order to buy narcotics.  Garcia got out of Manuel's car, and proceeded into an alley, just south of Armitage and west of Whipple, forming  a "T."  A parking lot adjoined the alley.  Manuel saw Garcia go into the alley, and then come running out.  Garcia told Manuel to open the door of the car and then said, "[s]tep on it!"  The two sped away from the alley.  Garcia was now holding a bag of cocaine.

On October 12, 1998, Garcia returned to the area near Whipple and Armitage with Jesus Fuentes and Esteban Rodriguez, who dropped him close to the same alley and waited.  Garcia got out of the van.  Neither watched Garcia when he left the van.  Fuentes drove the van around the block of Whipple and Armitage after waiting for about 15 minutes, looking for Garcia.  Fuentes drove around the block a second time, then to an alley at Whipple and Armitage where he saw a group of five or six men who looked like they were pushing or shoving each other further down the alley.  The alley was lit by a street light and Fuentes was able to see some of the young men's faces.  Rodriguez also saw the group of young men.  Rodriguez made an in-court identification of defendant and his two codefendants as three of the people he saw on the night of October 12, 1998.  Defendant was one of the people who Rodriguez saw pushing and kicking in the alley.  On their third drive around the block, Rodriguez and Fuentes went down the alley where they had seen the group of men, and found Garcia lying in a parking lot at the edge of the alley beaten and covered in blood, in the same spot where Fuentes and Rodriguez had seen the group of men.  Garcia was unconscious.  Rodriguez tried to lift Garcia into the van, but he was too heavy.  Fuentes and Rodriguez flagged down a police car, but were unable to communicate with the officers because Fuentes and Rodriguez only spoke Spanish and the officers could not understand them.  Rodriguez and Fuentes then went to tell Garcia's family what had happened.

Melloney Parker, on October 12, 1998, lived directly across the alley from the place where Garcia was beaten.  She was awakened at 1:55 a.m., looked out of the front window of her third floor apartment, and saw six or seven young men in various places across the alley.  They appeared to be involved in drug transactions.  Parker saw Garcia with codefenedant Tinajero and heard Tinajero say, "[w]here's my money?" and, "[f]uck that.  We are Latin Kings.  Fuck you, motherfucker."  As he said this, Tinajero hit Garcia.

Defendant's statement averred that he heard a commotion coming from the alley, saw Garcia lying on the pavement with codefendants standing around him, and was told that Garcia was a member of a rival gang, the Gangster Disciples.  Parker saw defendant punch Garcia while he was on the ground, and defendant admitted that he kicked Garcia hard in the ribs because Garcia was from a rival gang.  Defendant stated that he turned Garcia over with his foot, and noticed that Garcia was having a hard time breathing, his face was bloody and he was gasping for breath.  Defendant turned, walked away and went home to sleep.

During the beating, Parker could not see the faces of the men who were hitting Garcia.  A tree outside her window did not obscure Parker's view of the events in the alley.  Everyone she saw that night, including defendant, hit Garcia at some time during the beating.  After the beating, all of the men including defendant walked out of the alley.  Shortly thereafter, Tinajero walked back and continued to stomp on Garcia and, afterwards, got into a silver-gray car and also left the scene.

Officer Jesus Sanchez received a call of a man down at 1:50 a.m., October 12, 1998, went to the alley behind 1946 North Whipple, and saw a person lying on the ground 20 yards from the mouth of the alley.  The person was lying behind a gray van that Sanchez had to walk past to see the victim fully, later identified as Garcia.  At first, the officer thought Garcia was merely intoxicated, then noticed he was the victim of a battery, with blood pouring out of his face onto the ground.  The officer could see Garcia's injuries because the alley was lit by a street light.  Garcia was motionless and did not respond to verbal communication.  Sanchez called for an ambulance to take Garcia to the hospital.  There he learned that Garcia's injuries included fractured skull at the base on both the right and left sides, and his left temple was fractured.  It was unclear how many times he had been struck.  Garcia never regained consciousness; stayed in the hospital for two months; was removed to a nursing home; returned to the hospital on December 10, 1998, and died.  The medical examiner determined that Garcia died of cranial cerebral injuries due to blunt trauma.

On December 28, 1998, Margarita Casiano was at the 14th District Police Station on an unrelated matter and spoke with an investigator.  Casiano had been in the alley at Armitage and Whipple on the 13th or 14th of October 1998 and had witnessed defendant, codefendants and one other man talking to each other and laughing.  After telling the investigator what she had seen and heard, Casiano met with Detective Raynaldo Guevara on January 22, 1999, and identified a photograph of codefendant Kelly.  During trial, Casiano testified that she was familiar with all three defendants and identified each in court.  

On January 24, 1999, Detective Guevara went to the home of Parker and showed her six photographs.  Parker was able to pick Tinajero out of the photo array.  On February 8, 1999, Detective Guevara took Parker to Area Five Headquarters.  There she viewed a lineup and picked out defendant and Tinajero.  After the lineup, Parker spoke to Assistant State's Attorney (ASA) Jake Rubinstein and gave a statement.  Although she was not sure of the events during trial, she was certain of her identification of defendant and of the veracity of the statement she had given to Rubinstein.  At trial, Parker stated that she remembered maybe 50% of the event, but had been certain of the events described when she gave her statement.  

Rodriguez, one of Garcia's companions on the night of the beating, viewed a lineup of 12 men on February 8, 1999, from which he identified the three defendants.  Detective Guevara was in the room with him.  Rodriguez had spoken with Guevara before the lineup.  Rodriguez did not remember a time when he told Guevara that he had forgotten to tell the detective a number of details about the crime.  In Rodriguez's first statement to Guevara on February 4, 1999, he reported that people were throwing bottles at the van.  Rodriguez told Guevara that he had forgotten to tell him earlier that he had seen people in the alley.

Fuentes, Garcia's other companion that night, viewed a lineup on February 23, 1999, and picked out the three defendants.  Fuentes had spoken to Detective Guevara sometime between the beating and the lineup but did not remember the day.  At trial, Fuentes became confused regarding when he had spoken to the police, which photographs they had shown him, and who was with him when he identified defendants from the lineup.  Fuentes never gave a description of the people that he saw.  The State asserted that Fuentes had seen some photographs before the lineup although Fuentes testified on cross-examination that he had not.

ASA Rubinstein took Parker's statement on February 8, 1999, and took defendant's statement the next day.  Rubinstein told defendant that he was an attorney, but not defendant's attorney, nor was he an attorney for any of the codefendants.  He informed defendant of his constitutional rights, which defendant indicated  he understood and wished to give a statement.  The first conversation lasted for about 45 minutes.  Defendant agreed to give a handwritten statement; however, the first paragraph has a pre-printed portion with the constitutional rights written out.  Rubinstein had defendant read the paragraph aloud and then had defendant and Detective Troche, who was also present, sign underneath the paragraph.  Defendant was sitting right next to Rubinstein so that defendant could read along as the statement was being written.  Corrections were made in the statement and initialed by Rubinstein, defendant and Troche.  After reading through the statement, Rubinstein, Troche and defendant signed each page.

Once everything but the last paragraph had been written, ASA Rubinstein had defendant read a portion of the statement aloud.  Defendant identified some photographs, which were attached to the statement.  After the statement had been read through, a paragraph was added documenting the reading through of the statement and the making of corrections.  Afterwards, all three signed this paragraph as well.  When defendant was alone with Rubinstein he stated that he was feeling well and had been treated fine, had been given food to eat, and had been able to use the restroom whenever he needed to do so.  At the very end of the interview, a Polaroid photograph was taken of defendant.  Rubinstein, Troche and defendant each signed the photograph and it became an exhibit to the statement.  Excerpts from the statement are reproduced in an Appendix located at the end of this opinion, including an admission that defendant kicked Garcia twice as Garcia was lying on the pavement.  Appendix at A4.

Defendant was arrested on February 7, 1999, and the statement was taken on February 9, 1999.  ASA Rubinstein requested an extended investigative hold on defendant.  He was aware that detectives had spoken to defendant before he arrived.  Neither Rubinstein nor the detectives told defendant that he was wanted only as a witness.  Defendant's statement was received in evidence.  The State rested.  Defendant's motion for a finding was denied.

Defendant testified in his own defense.  He was 21 years-old and had three children.  He was arrested on February 7, 1999, and held for two days with nothing substantial to eat or drink.  The detectives were aggressive and yelled at him.  He tried to sleep during the two days, but someone consistently came in and woke him up.  Defendant testified that he was on Whipple Street on October 12, 1998, but that he stopped at a girl's house halfway up the block.  He started walking toward the noise that he heard coming from the alley.  In the alley he saw Tinajero walking away from Garcia, who was lying down behind a silver van.  He knew what had happened in the alley because he had heard fighting.  He nudged Garcia with his foot and turned him over.  He noticed Garcia was having a hard time breathing so he decided to flee.  Defendant denied telling ASA Rubinstein that he gave the victim a hard kick, and stated he never punched Garcia.  Detective Troche promised that if he just signed the papers that were going to be brought to him by the ASA he could go home.  The ASA was not in the room when the detective told him this.  He signed the statement without reading it because he figured that after he told them he had not done anything, they were going to use him only as a witness against Tinajero.  

On cross-examination, defendant admitted that he signed each page of the six-page statement, that it was his handwriting under the constitutional rights section, that he initialed a change that was made on the first page and initialed a correction on the second page of the statement.  He claimed he cannot read English very well.  The statement was entirely written up before he ever saw it.  The ASA just walked into the room and asked him to sign the statement.  Defendant admitted, however, that he gave the ASA specific information about his date of birth, high school education, address, and family information.  Defendant also admitted that information about him hanging out on the 1900 block of Whipple was true, as was the specific information contained in his statement about his gang affiliation and tattoos, but the ASA had put this information in his own words.  He signed the photograph of Tinajero during the taking of the statement; the photograph was presented to him during the interview; and he had known Tinajero for four or five years.  Defendant claimed that Kelly was not present on the night of the beating and that he had only seen Tinajero.  He had known Kelly for five or six years and knew that the picture defendant signed during the statement was Kelly.  He admitted that he told ASA Rubinstein specific information about another Latin King, Angel Serrano, and that this information was correct in the statement.  

Defendant admitted that he told ASA Rubinstein that he heard voices and saw a guy lying face down on the pavement.  Defendant signed each page of the statement and all the photographs, but did so without reading the pages or examining the photographs.  Defendant claimed that threats or promises were made that if he signed the statement, he would be used only as a witness.  Defendant testified that he was not allowed to sleep the entire time he was at the police station because people kept coming in every ten to fifteen minutes.  Two of the people who came in were Detectives Troche and Guevara; he could not name any of the other people who he claimed disturbed him.  The defense rested.  

Defendant was found guilty of first degree murder and aggravated battery.  The circuit court took into account the inconsistencies in the testimony of Fuentes and Rodriguez, and based its findings on the testimony of Parker.  The court stated: "I'm mindful that at trial Miss Parker was not certain about the details of the date in question. She was certain and unequivocal that her recollection which was reduced to writing was an accurate one."  The court pointed out her position in relation to the beating and her willingness to admit that she did not fully remember details of an incident that had happened years earlier.

Defendant moved for a new trial at the sentencing hearing, claiming that Parker had a warrant out for her arrest on an unrelated matter which was used to pressure her to participate.  Although defendant argued that this was not brought out at trial, defense counsel admitted that he knew of the information prior to trial and that he had a copy of the witness' record.

Parker was allowed to testify at the sentencing hearing over the State's objection.  She had an outstanding warrant for possession of stolen property when the police were investigating this case.  The police informed her of the warrant when they came to her door months later.  Detective Guevara took Parker to the police station and interviewed her there.  She did not know whether the door to the room where she was taken was locked.  She was not told that she was under arrest for the charge related to the warrant.  Guevara told her the warrant would be quashed if she would help the detectives identify the people from the night of the incident.  Parker identified defendant, basing her identification on what she saw on the night of the murder and not on the fact that she was threatened with arrest on the outstanding warrant.  Guevara never made any threats to Parker.  One year later when she was stopped while driving, Parker found out that the warrant had not been cleared up.

The circuit court denied defendant's motion for a new trial, finding that it was Parker's testimony that each and every person she saw, including defendant, participated in striking the victim.  After rereading the transcripts and statements, the court found that Parker never equivocated on her identification of defendant as one of the attackers.  

The circuit court then heard argument in aggravation and mitigation, following which defendant was sentenced to 25 years' imprisonment.  This appeal then followed.

I

Defendant first contends the State failed to prove he committed first degree murder beyond a reasonable doubt, because the testimony of Parker was impeached and contradicted by defendant's statement; Parker was an uncooperative witness; she could not identify who specifically struck the victim; and that her version of events did not agree with defendant's statement.  Defendant asserts further that because the State did not show that defendant alone beat Garcia, he could not have acted as a principal beyond a reasonable doubt.  

On review, a conviction will not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there remains a reasonable doubt as to defendant's guilt.  
People v. Collins
, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).  The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
(footnote: 2)  
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed 560, 99 S. Ct. 2781 (1979); 
Collins
, 106 Ill. 2d at 261.

A

Defendant argues his conviction cannot be upheld where the circuit court premised its finding of guilt solely on Parker's testimony, which he alleges lacked sufficient credibility, having been impeached and contradicted by his own inculpatory statement, which relates that he kicked Garcia after the beating ended; however, according to Parker, defendant only punched Garcia and Tinajero kicked him.  Parker's credibility is challenged by virtue of her diminished ability to recall the events at trial, defendant urges, such as the poor lighting conditions, the distance, the time of observation, her inability to see faces in the midst of the attack, and her failure to specify who actually beat Garcia, or how many times defendant struck him.

In a bench trial, the circuit court determines the credibility of the witnesses, evaluates the evidence and resolves any inconsistencies therein.  
People v. Ortiz
, 188 Ill. App. 3d 506, 514, 544 N.E.2d 1019 (1989).  The identification testimony of a single eyewitness is sufficient to sustain a conviction.
  
People v. Ramos
, 339 Ill. App. 3d 891, 901, 791 N.E.2d 592 (2003).  A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or on the credibility of witnesses unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt.  
Ramos
, 339 Ill. App. 3d at 901. 

In the case 
sub
 
judice
, the circuit court found defendant guilty "based primarily on what [it] believe[d] to be the clear, credible, and convincing testimony of Miss Parker," the court stating, "I'm mindful that at trial Miss Parker was not certain about the details of the date in question.  She was certain and unequivocal that her recollection which was reduced to writing was an accurate one. ***  I believe that we can discount the testimony of Mr. Rodriguez without causing any challenge to the accuracy of the testimony of Miss Melloney Parker."  The court then noted the disparity between defendant's rendition and Parker's, but chose to believe Parker, finding that her in-court inconsistencies strengthened her credibility. 

In viewing the evidence in the light most favorable to the State, the circuit court properly could have found that defendant was proved guilty of murder beyond a reasonable doubt.

B

Defendant next argues that the State failed to prove him guilty as a principal since the circuit court rejected premising defendant's guilt on an accountability theory.  Defendant maintains the State did not prove that he alone beat the victim or that he caused Garcia's death, Parker's vantage point was inadequate for her to see defendant strike Garcia enough times or with sufficient force to have caused his death and, absent his exclusive responsibility for Garcia's death, he could not have been proven guilty as a principal.

Pursuant to section 9-1(a) of the Criminal code of 1961 (720 ILCS 5/9-1 (a)(1),(2) (West 1998)), "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another."  To prove defendant guilty of murder as a principal, the prosecution must show, 
inter
 
alia
, that an act of defendant contributed to the victim's death (
People v. Brown
, 169 Ill. 2d 132, 152, 661 N.E.2d 287 (1996)
); however, the act need not be the sole or immediate cause of death.  
People v. Brackett
, 117 Ill. 2d 170, 176, 510 N.E.2d 877 (1987).  The evidence must demonstrate that the victim's death was not caused by a source unconnected to defendant's act.  
People v. Lara
, 289 Ill. App. 3d 675, 680, 683 N.E.2d 480 (1997)
.

Here, contrary to defendant's interpretation, the circuit court did not reject his guilt based on accountability; rather, the court merely recognized that the evidence was sufficient to prove him guilty as a principal.  Parker saw defendant participate in the group beating of Garcia.  Although she could not see who struck each blow or how many there were, she was unwavering in her assertion that each person struck Garcia in some fashion and in her identification of defendant as participating in the onslaught, from which Garcia sustained injuries and died.  Parker clearly saw defendant in the alley, and repeatedly identified him as striking Garcia.  The court found credence in Parker's testimony and no basis exists upon which to disturb that assessment.  

In examining this issue in the light most favorable to the State, the circuit court was entitled to find defendant guilty of murder beyond a reasonable doubt as a principal.

As there was sufficient evidence, from which the circuit court found defendant guilty as a principal, defendant's next contention, that he was not proved guilty of murder under an accountability theory, is irrelevant and, therefore, need not be addressed.

II

Defendant identifies error in the circuit court's admission of Parker's written statement in evidence as a prior inconsistent statement under the hearsay exception in 725 ILCS 5/115-10.1 (West 2000) (section 115-10.1).  

Defendant claims the State failed to show the statement was inconsistent with Parker's trial testimony and used it improperly as corroboration, thereby leaving the first condition unsatisfied under section 115-10.1.  Defendant also claims that Parker's inability to recall the events rendered her incapable of cross-examination, the second condition of section 115-10.1, denying him the opportunity to test the veracity of the statement prior to having it considered substantively as proof of guilt, citing 
People v. Yarbrough
, 166 Ill. App. 3d 825, 832, 520 N.E.2d 1116 (1988) (
Yarbrough
).  There, the witness could not remember making an out-of-court statement, and was found to have "effectively made impossible any cross-examination with respect to the truth or falsity of the out-of-court statements," thereby thwarting the second condition of section 115-10.1.  
Yarbrough
, 166 Ill. App. 3d at 832.

Defendant failed to raise this issue in his post-trial motion.  To preserve an issue for review defendant must both object at trial and specifically include the objection in a post-trial motion.  
People v. Lindsey
, 201 Ill. 2d 45, 53, 772 N.E.2d 1268 (2002) (
Lindsey
).  The failure to raise an issue in a written motion for a new trial results in waiver of that issue on appeal.  
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988) (
Enoch
).  Supreme Court Rule 615(a), however, allows a court to review an argument not properly preserved if it concludes that an error affecting a substantial right has occurred  (
People v. Shaw
, 186 Ill. 2d 310, 326-27, 713 N.E.2d 1161 (1998)), or if it is of such magnitude that the commission thereof denies defendant a fair and impartial trial.  
People v. Miller
, 327 Ill. App. 3d 594, 598, 763 N.E.2d 865 (2002).  Since this matter bears on defendant's right to a fair trial, this issue will be reviewed as plain error.

Section 115-10.1 provides, in part, that "[i]n all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if (a) the statement is inconsistent with his testimony at the hearing or trial, (b) the witness is subject to cross-examination concerning the statement, and (c) the statement -- (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and (A) the statement is proved to have been written or signed by the witness.  725 ILCS 5/115-10.1 (West 2000).  

The prior testimony need not directly contradict testimony given at trial to be considered "inconsistent" (
People v. Grayson
, 321 Ill. App. 3d 397, 409, 747 N.E.2d 460 (2001)), and is not limited to direct contradictions but also includes evasive answers, silence, or changes in position.  
People v. Flores
, 128 Ill. 2d 66, 87, 538 N.E.2d 481 (1989) (
Flores
),
 quoting 
United States v. Williams
, 737 F.2d 594, 608 (7th Cir. 1984).  "[T]he confrontation clause is not violated by admitting a declarant's out-of-court statements, as long as a declarant is testifying as a witness and subject to full and effective cross-examination.  
[Citations.]  A gap in the witness' recollection concerning the content of a prior statement does not necessarily preclude an opportunity for effective cross-examination."  
Flores
, 122 Ill. 2d at 88.  T
he
 "opportunity is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief."  
Flores
, 122 Ill. 2d at 89, quoting 
United States v. Owens
, 484 U.S. 554, 559, 98 L. Ed 2d 951, 108 S. Ct. 838 (1988).

In 
People v. Wheatley
, 187 Ill. App. 3d 371, 380, 543 N.E.2d 259 (1989), defendant argued that his sixth amendment right to confront witnesses was violated when the witness testified, "I don't remember," in response to defendant's cross-examination questions.  The 
Wheatley
 court rejected this argument, relying on  
Flores
.  Both 
Flores
 and 
Wheatley
 were decided subsequent to 
Yarbrough
, the case upon which defendant relies
.

In the present case, Parker readily admitted she could not remember all the details of the incident to the extent she could on the night she was questioned by police.  Although she implicated defendant both at trial and in her statement, the circuit court found that her genuine lack of recollection on germane matters bolstered her credibility.  Parker's limited recall rendered her in-court testimony inconsistent with her written statement.  Under 
Flores
, the first condition of section 115-10.1 was satisfied.  

The record demonstrates that defendant did, in fact, thoroughly cross-examine Parker.  He questioned Parker on her ability to recall the circumstances surrounding the statement, and in so doing, challenged its reliability.  D
efendant had ample opportunity to cross-examine Parker as contemplated by the second condition of section 115-10.1 and 
Flores
.  

The circuit court did not err in admitting Parker's written statement as admissible hearsay under section 115-10.1 where her in-court testimony was inconsistent with her prior statement and where defendant was given the opportunity to challenge Parker's credibility through cross-examination.

In his petition for rehearing, defendant seeks reconsideration of this issue in light of the Supreme Court's recent decision, 
Crawford v. Washington
, ___ U.S. ___, ___ L. Ed. 2d ___, 124 S. Ct. 1354 (March 8, 2004) (
Crawford
).  Defendant correctly asserts that 
Crawford
 applies to this case.  Our Supreme Court consistently has held that judicial opinions announcing new constitutional rules applicable to criminal cases are retroactive to all cases - such as this one - pending on direct review at the time the new constitutional rule is declared.  
People v. Ford
, 198 Ill. 2d 68, 73, 761 N.E.2d 735 (2001), citing 
Griffith v. Kentucky
, 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987), and 
People v. Hudson
, 195 Ill. 2d 117, 126, 745 N.E.2d 1246 (2001).

In 
Crawford
, the prosecution presented an out-of-court statement made by defendant's wife.  The court held that the admission in the statement against defendant at trial violated the confrontation clause.  The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him."  
Crawford
, 124 S. Ct. at 1357.  Defendant was tried for assault and attempted murder after stabbing a man who allegedly attempted to rape his wife.  To counter defendant's claim of self-defense, the State introduced a tape-recorded statement his wife made to police during her interrogation shortly after the stabbing.  Defendant's wife did not testify at trial because defendant asserted his marital privilege.  The jury convicted him of assault.  The state appellate court reversed, but the Washington Supreme Court reinstated the conviction, holding that the wife's statement had sufficient guarantees of trustworthiness, although it did not fall within a firmly rooted hearsay exception.  
Crawford
, 124 S. Ct. at 1374.  

The United States Supreme Court unanimously reversed and remanded.  Justice Scalia wrote the Court's opinion for seven Justices, with the Chief Justice and Justice O'Connor concurring in judgment.  The Court noted that 
Ohio v. Roberts
, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), held that the confrontation clause is not violated where an unavailable witness's statement is admitted against defendant if the statement bears adequate "indicia of reliability"; either it falls within a "firmly rooted hearsay exception," or it contains "particularized guarantees of trustworthiness."  
Roberts
, 448 U.S. at 66.  The Court in 
Crawford
 explained that "the principal evil at which the Confrontation Clause was directed was the civil law mode of criminal procedure, and particularly its use of 
ex
 
parte
 examinations as evidence against the accused."  
Crawford
, 124 S. Ct. at 1363.  The Court held that the protections of the confrontation clause are not limited to in-court testimony during trial, but apply to the use of out-of-court statements at trial, such as the unsworn statement defendant's wife gave to the police.  
Crawford
, 124 S. Ct. at 1364.  The Court concluded:

"Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law – as does 
Roberts
, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.  Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.  We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'  Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or a former trial; and to police interrogations.  These are the modern practices with closet kinship to the abuses at which the Confrontation Clause was directed."  
Crawford
, 124 S. Ct. at 1374. 

In the instant case, the circuit court admitted Parker's written statement taken by ASA Rubinstein.  Under 
Crawford
, this statement is clearly "testimonial"; however, this does not conclude the analysis.  The 
Crawford
 Court also held:

"Finally, we reiterate that when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.  See 
California v. Green
, 399 U.S. 149, 162, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970).  It is therefore irrelevant that the reliability of some out-of-court statements 'cannot be replicated, even if the declarant testifies to the same matters in court.'  
Post
, at 6 (quoting 
United States v. Inadi
, 475 U.S. 387, 395, 89 L. Ed. 2d 390, 106 S. Ct. 1121 (1986)).  The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."  
Crawford
, 124 S. Ct. at 1369.

As explained previously, Parker's testimony comported with the requirements of section 115-10.1, including the requirement of subsection (b), that she be subject to cross-examination concerning the statement.  Where Parker was available in court and on the witness stand, Parker was, in fact, subject to cross-examination, and her statements admitted pursuant to section 115-10.1 are not violative of 
Crawford
.

It is important to note that in determining whether a prior out-of-court statement is admissible, the proponent of the statement first must meet the requirements of the applicable statutory hearsay exception as set out in 725 ILCS 5/115-10 
et
 
seq
. (West 2002).  The holding in 
Crawford
 should be considered only after the court determines the proffered statement complies with the requirements of the applicable statute.  Here, Parker's written statement complied with the requirements of both section 115-10.1 and 
Crawford
; the circuit court did not err in its admission of Parker's statement.

III

Defendant next contends the circuit court erred in admitting his written statement.  He contests only the timing of the statement's admission, which occurred after the State inadvertently rested its case-in-chief as to defendant.  He points to the colloquy where court inquired, "[i]n the case of Mr. Kelly and Martinez, State rests, is that correct?"  The prosecutor responded, "State rests, Judge."  Defendant maintains that the State may not reopen its case where its failure to act lacks explanation or results from mere neglect.  

Defendant admits that defense counsel did not object when the statement was introduced or when the State offered its exhibits into evidence, and further failed to include it in his motion for new trial.  To preserve an issue for review defendant must both object at trial and specifically include the objection in a post-trial motion (
Lindsey
, 201 Ill. 2d at 53), where the failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal.  
Enoch
, 122 Ill. 2d at 186.  The plain error doctrine, however, may be applied where the evidence is closely balanced or the error was of such magnitude as to have deprived defendant of a fair trial.  
People v. Ware
, 264 Ill. App. 3d 650, 657, 636 N.E.2d 1007 (1994).  Since Parker's statement was integral to the circuit court's determination of guilt, this issue will be reviewed as plain error.

Illinois law generally recognizes the power of a circuit court to allow a litigant to reopen his or her case in an appropriate circumstance (
People v. Canulli
, 341 Ill. App. 3d 361, 367, 792 N.E.2d 438 (2003)), even after the State has rested its case, not only as to mere formalities, but facts essential to prove an element of the offense.  
People v. Faulkner
, 64 Ill. App. 3d 453, 457, 381 N.E.2d 321 (1978).  The exercise of a court's discretion  will not be reversed absent a clear showing of abuse.  
People v. Myles
, 257 Ill. App. 3d 872, 886, 629 N.E.2d 648 (1994).  
 In the case 
sub
 
judice
, the State made no motion to reopen its case; rather, the circuit court and the parties simply proceeded as if the State had not rested.  The State formally rested only after presenting defendant's statement but before the defense presented its case.  Neither the parties nor the court believed the State rested.  Defendant incurred no prejudice as a result of the alleged error.  The court did not abuse its discretion.  

IV

Defendant contends lastly that he received ineffective assistance of counsel since his attorney did not move to suppress his inculpatory statement.  Defendant believes a motion to suppress would have been successful because of his prolonged confinement in a custodial setting, and police misconduct in obtaining his statement involuntarily.

As to his confinement, defendant complains that after his arrest, he remained in custody for two days until he gave a statement; the delay in bringing him before a judge affected the voluntariness of his confession; his will was overcome by police, who coerced him by misleading him to believe that he was to be only a witness; police aggressively yelled at him and prevented him from sleeping by conducting numerous questioning sessions; and Detective Troche told him that since he did not kill the victim, he needed to sign the statement as a witness against Tinajero.  Given the totality of these circumstances, he concludes, counsel was ineffective for not seeking to suppress his statement.

In Illinois, ineffective assistance of counsel is established when a defendant shows (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that, but for counsel's shortcomings, a reasonable probability exists that the result of the proceedings would have been different.  
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) (
Strickland
); 
People v. Albanese
, 104 Ill. 2d 504, 524-25, 473 N.E.2d 1246 (1984).  This standard does not require that counsel's conduct more likely than not altered the outcome of the case (
People v. Patterson
, 192 Ill. 2d 93, 122, 735 N.E.2d 616 (2000)); instead, a "reasonable probability" is one "sufficient to undermine confidence in the outcome."  
Strickland
, 466 U.S. at 694.  A reviewing court must indulge in a strong presumption that counsel's performance was competent and that the challenged action or inaction of counsel was the product of sound trial strategy and not incompetence.  
People v. Coleman
, 183 Ill. 2d 366, 397, 701 N.E.2d 1063 (1998)
. 

As a general rule, matters of trial strategy, such as whether to file a motion to suppress, are immune from claims of ineffective assistance of counsel.  
People v. Nunez
, 325 Ill. App. 3d 35, 42, 756 N.E.2d 941 (2001).  Counsel's failure to file a motion to suppress does not establish incompetent representation when that motion would be futile; as it is a matter of trial strategy to file such a motion, counsel's decision will be accorded great deference.  
People v. Pacheco
, 281 Ill. App. 3d 179, 183, 666 N.E.2d 670 (1996).  Defendant must show that a reasonable probability exists both that the motion would have been granted and that the outcome of the trial would have been different had the evidence been suppressed.  
People v. Lundy
, 334 Ill. App. 3d 819, 830, 779 N.E.2d 404 (2002).

Pursuant to 725 ILCS 5/109-1(a) (section 109-1), "[a] person arrested with or without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county ***."  725 ILCS 5/109-1(a) (2000).  Once defendant in lawful custody has knowingly waived his or her Miranda rights and indicated a willingness to talk to police, however, section 109-1(a) does not obligate police to interrupt their interrogation as long as its length is not unreasonable and defendant's statements continue to be voluntary.  
People v. Ballard
, 206 Ill. 2d 151, 178, 794 N.E.2d 798 (2002) (
Ballard
).  Even 72 hours between an arrest and the arraignment does not 
per
 
se
 render such a statement involuntary.  
People v. Taylor
, 40 Ill. 2d 569, 573-74
,
 241 N.E.2d 409 (1968).  

Nor does failure to comply with section 109-1 by itself, obviate or render an otherwise voluntary confession inadmissible; rather, such delay is merely a factor to be considered on the question of voluntariness.  
Ballard
, 206 Ill. 2d at 176.  The test of voluntariness is whether defendant made the statement freely, voluntarily and without compulsion or inducement, or whether defendant's will was overcome at the time of confession.  
Ballard
, 206 Ill. 2d at 177.  Such a determination requires consideration of the "totality of the circumstances" of each case, including: defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; whether defendant was advised of his constitutional rights; and whether defendant was subjected to any physical or mental abuse.  
Ballard
, 206 Ill. 2d at 177.

Here, defendant claims his counsel had two legitimate bases to file a motion to suppress - his prolonged detention and police misconduct - both of which involve voluntariness.  Defendant's written statement avers that he was treated well and received no promises in exchange for his statement.  ASA Rubinstein and Detective Troche (by way of stipulation) testified that they did not promise defendant he was to be only a witness in the case.  With this information, counsel decided not to seek suppression of the statement.  Where the length of detention is but one factor to be considered in determining voluntariness and defendant waived his Miranda rights, and his statements of police misconduct were undermined and contradicted by the State's evidence, counsel was not ineffective for failing to seek suppression of the statement.  

Further, the circuit court heard defendant's testimony, in which he explained his alleged maltreatment and promises of witness status.  The court was presented with virtually the same evidence it would have considered in defendant's motion to suppress, yet found the evidence unavailing.  Defendant has failed to demonstrate both that the motion would have been granted and that the outcome of the trial would have been different had the evidence been suppressed.

Defendant also argues that his counsel was ineffective for failing to object and preserve certain issues on appeal, namely,  the introduction of Parker's statement and his own statement after the State prematurely rested its case-in-chief.

Trial strategy generally encompasses counsel's decisions "as to when and to what matters objection should be made."  
People v. Jones
, 302 Ill. App. 3d 892, 899, 707 N.E.2d 192 (1998).  Even if the evidence were clearly inadmissible, incompetency of counsel is not established by mere failure to object to such evidence; 
 "defendant is entitled to competent, not perfect or successful, representation."  
People v. Murphy
, 72 Ill. 2d 421, 438, 381 N.E.2d 677 (1978).

Further, defendant's reading of the record is inaccurate.  When the State sought to admit Parker's out-of-court statement, counsel did, in fact, timely object, although stating that he did not "have a legal leg to stand on."  As to defendant's own statement, the record reveals that neither counsel nor the circuit court believed the State previously had rested its case, as discussed in Point III.  Under these circumstances, counsel was not ineffective for failing to object.  Defendant has not overcome the strong presumption favoring trial strategy above incompetence.

Accordingly, the judgment of the circuit court of Cook County is affirmed. 

Affirmed.

QUINN, P.J., and GREIMAN, J., concur.

APPENDIX

At trial, ASA Rubinstein read defendant's statement into the record:

"Statement of John Martinez taken February 9, 1999, at 6:45 a.m. at Area 5 Violent Crimes. Present ASA Jake Rubinstein, Detective R. Troche, number 21212. This statement taken regarding the fatal beating of Daniel Garcia which occurred on October 12, 1998 at 1946 North Whipple at about 1:55 a.m.

* * *

John can read and write English. John went to high school at Shurs [
sic
] in Chicago but only finished one year.

John Martinez states that on October 12th, 1998, he was hanging out on the block. ***

***

John has been a Latin King for seven years. John has no rank as a Latin King. John has the letters L.K. tattooed on the inside of his left forearm. John also has a crown tattoo next to his left eye. John also has a crown tattoo on his left back shoulder. The crown is the symbol of the Latin Kings.

John has been hanging out on the 1900 block of Whipple for about 4 years. The Latin Kings on the 1900 block of Whipple sell drugs, including crack. John states that when he got to the 1900 block of Whipple on October 12, 1998, it was some time after 1:00 a.m. When *** he got to the 1900 block some other Latin Kings were already there hanging out. One of the Latin Kings on the block was Jose Tinajero whose nickname is Baby Toy. John recognized Jose Tinajero from exhibit A, a photograph of him. John has known Jose for 5 or 6 years.

Another Latin King on the block was Thomas Kelly whose nickname was Snoop or Snoopy. John recognizes Thomas from the exhibit B, a photograph of him. John has known Thomas for about 5 or 6 years.

***

John states that after arriving on the block on October 12, 1998, he walked up and down the block for [a]while. He stopped from time to time to talk to friends who were also hanging out on the block. John states that 'on the block' is a term the Latin Kings use to refer to the 1900 block of North Whipple.

As John was walking on the block, he heard a commotion coming from an alley which makes a T into Whipple just south of Armitage. The commotion sounded like men[']s voices. John states that when he heard this commotion he walked down to the alley which is just south of Armitage. In the alley is a parking lot which is almost part of the alley because the entrance to the parking lot is in the alley.

When John got to the alley, he was a man lying facedown on the pavement. The man appeared to be Hispanic and John thought he looked Mexican. John recognized the man from exhibit D, a photograph of him. John now knows this man's name to be Daniel Garcia.

John saw several Latin Kings from the block standing around Garcia as Garcia lay there. The Latin Kings John saw were Jose Tinajero, Angel Serrano and Thomas Kelly. When John saw this, he walked over to where *** Garcia was lying. This is the parking lot that borders on the alley just south of Armitage.

As John walked up, someone told him Garcia was a D. John states a D means a Disciple. Disciples are a rival gang and Disciples and Latin Kings are enemies and fight each other constantly. John cannot remember who told him that Garcia was a D.

When John got close to Garcia, he saw some blood around Garcia's head. John approached Garcia and gave Garcia a hard quick [
sic
] with John's foot. The first kick landed on Garcia's side in the area of his ribs, but below his shoulders. John kicked him because Garcia was a D and John is a Latin King. John then kicked Garcia again in the same place. The second kick was not as hard as the first one. The second kick was to tell Garcia to get out of there because he did not belong around there.

After John kicked Garcia the second time John used his foot to roll Garcia over onto his back. When Garcia rolled onto his back, John heard a sucking sound coming from Garcia like he was having a hard time breathing. When John rolled Garcia over he saw Garcia's face was bloody and had been beat up. After John rolled Garcia over he heard Garcia gasping for breath. John then turned around and walked away. John walked up the block and got in his car. John then drive around for [a]while after driving around for [a]while, John went home and went to sleep.

John Martinez states that he has been treated well by the police and by Assistant State's Attorney Jake Rubinstein. John states that he has been given pop to drink, clips [
sic
] and Salsa to eat and was offered other food to eat. John has been allowed to use the bathroom whenever he needed to. John is giving this statement freely and voluntarily. No threats or promises were made to John to get him to take this statement.

***

John Martinez states that he can read English and he demonstrated his reading ability by reading the first paragraph of this statement out loud."

FOOTNOTES
1:
Two codefendants, Thomas Kelly and Jose Tinajero, not involved in this appeal, elected to take a simultaneous bench trial and a jury trial, respectively.

2:
The standard of review is the same for both subsections of Point I (A and B) of this opinion.