928 So.2d 951 (2006)
David BELL, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-00513-COA.
Court of Appeals of Mississippi.
May 9, 2006.
*952 Imhotep Alkebu-Lan, Jackson, attorney for appellant.
Office of the Attorney General by W. Daniel Hinchcliff, attorney for appellee.
Before KING, C.J., BARNES and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. On February 4, 2004, a jury sitting before the First Judicial District of the Hinds County Circuit Court found David Bell guilty of murdering Charity Ishman. Consequently, the trial judge sentenced Bell to life imprisonment in the custody of the Mississippi Department of Corrections. Posttrial, Bell filed unsuccessful motions for a new trial and for a judgment notwithstanding the jury's verdict. Aggrieved, Bell appeals and raises the following issues listed verbatim:
I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT HELD THE UNAVAILABILITY HEARING IN BELL'S ABSENCE.
II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING BELL HIS FEDERAL AND STATE CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM.
III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED THE LAY WITNESS TO TESTIFY TO HIS OPINION THAT INDIVIDUALS WHO DID NOT TESTIFY AT TRIAL WERE TELLING THE TRUTH.

*953 IV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED BELL'S MOTION FOR A DIRECTED VERDICT.
V. THE TRIAL COURT ABUSED ITS DISCRETION BY EXCLUDING RELEVANT EVIDENCE FAVORABLE TO BELL.
VI. THE CUMULATIVE IMPACT OF THE TRIAL COURT ERRORS VIOLATED BELL'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
Finding that the circuit court erred when it permitted the State's introduction of evidence contrary to Bell's constitutional right to confront the witnesses against him, we reverse and remand to the circuit court for a new trial.

FACTS
¶ 2. Around 9:00 a.m. on August 14, 2000, Christopher Thompson found two very young girls at the front door of his home in Jackson, Mississippi. The two young girls, Adrienne and Ashley, lived next door with their mother, Charity Ishman. The girls, then aged four and five, asked Mr. Thompson to take them to school. Mr. Thompson asked the girls where he could find their mother. They explained that their mother could not drive them to school because she was dead. Alarmed, Mr. Thompson walked next door with the girls. Mr. Thompson found Charity dead on her living room floor. Mr. Thompson immediately took Adrienne and Ashley back to his house and called the Jackson Police Department.
¶ 3. Officer Jeremiah Jones of the Jackson Police Department was the first law enforcement officer on the scene. Officer Jones arrived at approximately 9:17 a.m. Officer Jones found Charity sitting slumped over in the living room floor. Officer Jones went through Charity's house and made sure that Charity's killer was not still there. After Officer Jones cleared the house, an ambulance arrived and the attendants verified that Charity was dead. Then, Officer Jones called his supervisor, the mobile crime lab, homicide detectives, and the coroner. Afterwards, Officer Jones started the initial investigation of the crime scene. Officer Charles Keys arrived shortly after Officer Jones. Together, they set up a perimeter around the crime scene and made sure that no one tampered with or otherwise disturbed any potential evidence.
¶ 4. Detective Al Taylor arrived next. After he spoke with Officers Jones and Keys, Detective Taylor talked with Mr. Thompson. Mr. Thompson told Detective Taylor that he discovered Charity when he went next door with Adrienne and Ashley. Detective Taylor then spoke with Adrienne and Ashley. Adrienne, the younger of the two girls, told Detective Taylor what happened to her mother, albeit in the language of a four-year-old. Adrienne also indicated that her father, David Bell, killed Charity. Adrienne elaborated.
¶ 5. According to Adrienne's version of the events of the previous night, (a) Charity was dead and had "blood on her back;" (b) Bell visited Charity and asked her for money; (c) Charity emptied her purse out on the floor; (d) Bell pushed Charity down over a table, broke the table, and then tried to fix the table; (e) Bell stepped on Charity; (f) Bell broke a mirror in Charity's bathroom; (g) Bell told her and Ashley to go to bed, that he would be back, but he never came back; (h) Bell used a small knife to put blood on her mother's back; and (i) Bell broke the front door when he left. After Detective Taylor spoke with the girls, he asked Sergeant Geraldine Green to drive the girls to police headquarters.
*954 ¶ 6. Before Sergeant Green drove the girls to police headquarters, Sergeant Green interviewed Adrienne and Ashley. Sergeant Green asked the girls questions as they sat in the front seat of her patrol car. Sergeant Green wrote down Adrienne's and Ashley's responses. According to Sergeant Green, Adrienne told her that she was asleep in Charity's bed when she heard Bell and Charity arguing. She heard Bell ask Charity, "[A]re you going to give me the money." Adrienne then heard Charity say, "I have to take my kids to school." When Adrienne got out of bed, she went into the living room, and saw Charity lying on the floor with "blood on her back." Adrienne also told Sergeant Green that she saw her father and that he wore a black tee shirt and a hospital mask. Ashley, the older of the two girls, told Sergeant Green that Adrienne woke her up and that she got out of bed, walked into the living room, and saw Charity lying on the living room floor with blood on her back. Sergeant Green then drove the girls to police headquarters.
¶ 7. Detective James Roberts, a crime scene investigator, was responsible for collection, preservation and documentation of evidence gathered from Charity's house. Once he arrived, he photographed the area. Detective Roberts observed that pieces of Charity's front entry door facing were lying on the floor and the dead bolt was exposed. Detective Roberts concluded that Charity's door had been kicked in or pushed in. To Detective Roberts, that indicated that Charity's killer forced his or her way into Charity's home.
¶ 8. Detective Roberts also noticed that Charity had been stabbed repeatedly and that she had scratches and bruises on her neck indicative of her being choked. Additionally, Detective Roberts observed that: (a) Charity's coffee table was overturned; (b) shirt buttons were on the floor; (c) a purse was lying on the floor with the contents dumped out; and (d) Charity's bathroom mirror was broken. Detective Roberts concluded that Charity struggled with her killer. Though he found latent fingerprints on Charity's bathroom mirror, those fingerprints were not sufficient to produce a positive identity match.
¶ 9. Meanwhile, Bell happened to visit the crime scene. Around 9:30 a.m., Bell walked up to Officer Keys and introduced himself. Bell told Officer Keys that Charity was his ex-girlfriend. Officer Keys contacted Detectives Taylor and Roberts and told them that Bell was at the scene. The detectives told Officer Keys to put Bell in his patrol car so they could question him. Officer Keys put Bell in his patrol car. Approximately ten to fifteen minutes later, at the request of the detectives, Officer Keys took Bell to police headquarters.
¶ 10. Later that day, Detective Taylor interviewed Bell. Bell gave a voluntary oral statement, but refused to commit that statement to writing. According to Detective Taylor's recollection of Bell's oral statement, Charity was Bell's ex-girlfriend and the mother of two of his seven children. Further, Bell had not seen Charity since Father's Day, approximately two months prior to the date of his statement. Bell also said that Charity was stalking him and obsessed with him.
¶ 11. Bell explained his presence at the crime scene when he told Detective Taylor that he came by Charity's house because he heard she had been killed. Bell also gave an alibi. According to Bell, he did not see Charity on the day before she was found murdered. Instead, he spent the day attempting to visit various unnamed people and eventually fell asleep on his couch.
¶ 12. Around noon, Detectives Rozerrio Camel, Taylor, Eugene McDonald, Will Gardner and Sergeant Green interviewed *955 Adrienne and Ashley for the third time. This time, Tahona Williams, Adrienne's and Ashley's godmother, was with the girls. For the most part, Detective Camel and Detective Taylor asked the questions. Ms. Williams occasionally asked questions as well.
¶ 13. During that third interview, Adrienne again said that Charity "got blood on her back." Detective Taylor then asked Adrienne how Charity got blood on her back. Adrienne responded, "my daddy." Detective Taylor next asked Adrienne how she knew that Bell put blood on Charity's back. Adrienne responded, "'[c]ause I saw him." When asked how Bell put blood on Charity's back, Adrienne said, "[t]hey both was fighting." Adrienne reiterated that Charity and Bell were fighting because Charity would not give him any money. Adrienne also repeated her earlier statements regarding the broken coffee table, broken bathroom mirror, and the fact that Charity emptied her purse.
¶ 14. The detectives also showed the girls a photo lineup. Neither Adrienne nor Ashley could identify Bell. According to Officer Camel, the photo in the lineup was an older photo of Bell. In that older photo, Bell was clean-shaven. In the photo taken the day he was arrested, Bell had a beard and mustache. However, Adrienne again indicated that Charity's killer wore a surgical mask:
Camel: You know anybody on this picture? Why did you point to picture # 3 and tell me that don't look like him, like your daddy? Huh?
Adrienne: He don't look like all of them.
Camel: Huh?
Adrienne: He don't look like all of them.
Taylor: Which one he look like?
Camel: Which one he look like?
Adrienne: He have a (inaudible) on his mouth like a doctor.
Camel: Like a what?
Adrienne: Like a doctor.
Camel: Okay, just imagine that he ain't got a mask on his mouth. You seen your daddy . . . have you seen your daddy wearing a mask? Have you ever seen him without a mask on?
Adrienne: (inaudible)
Camel: Huh? Have you ever seen him without the mask on?
Adrienne: I saw him and my mama told him to pull it off.
Camel: Did you see him when he took it off?
Adrienne: He didn't take it off.
¶ 15. On May 13, 2003, the State filed a motion to allow Adrienne's and Ashley's statements into evidence through hearsay testimony. That is, the State asked the circuit court to find the girls unavailable pursuant to M.R.E. 804(a)(6) and to find that the various police officers who interviewed them could testify as to what Adrienne and Ashley told them under M.R.E. 803(2), the "excited utterance" exception to the hearsay rule. On July 2, 2003, Bell responded and argued that the circuit court should not allow the officers to testify to the girls' hearsay testimony. The circuit court considered the State's motion at a hearing on Friday, July 11, 2003.
¶ 16. Bell did not attend that hearing. According to Bell's trial attorney, Tom Royals, Mr. Royals notified Bell of the hearing when he sent Bell a letter on the Wednesday before the hearing. Mr. Royals further explained that he also tried to contact Bell by phone, but was unsuccessful. Mr. Royals did not know where Bell was at that time. The circuit court began to reset the matter for the following Friday, but Dr. Angela Herzog, the clinical psychologist who would testify as to whether it would be in the girls' best interests to testify, explained that she would *956 not be able to attend the rescheduled hearing. To accommodate all parties, the circuit court decided to take up the issue of whether the girls were "unavailable" pursuant to M.R.E. 804(a)(6). However, the circuit court also concluded that Bell should not be absent from the hearing on whether the various police officers could testify as to the girls' hearsay statements under the excited utterance exception. Consequently, the circuit court rescheduled the hearsay hearing for the following Friday.
¶ 17. According to Dr. Herzog:
It would have a profoundly devastating effect upon both of the girls to be required to discuss the issue of their mother's death, especially in context of any questions as to the causes of the mother's death. It's difficult for them to do that in a clinical setting, in a casual setting, and it has been impossible thus far for them to do that in a setting  in this courtroom setting when the father was not present, let alone when the father would be present.
During Mr. Royals' cross-examination, Dr. Herzog further explained her conclusion. Dr. Herzog initially interviewed Adrienne and Ashley in her office. In attempting to reach a professional conclusion on the potential psychological harm to the girls, should they testify, Dr. Herzog had the girls visit the courtroom at a time when no proceedings were taking place. Dr. Herzog further explained:
This was a process that originated in my office of developing a capacity on the children to even talk about this because of their apprehension and distress. For the first couple of times that I met with them it took hours just to develop a rapport with them because these children were so shut down on this issue.
So we did a desensitization paradigm to try to approach the courtroom setting. And we did eventually get them in here, and they were unable to physically  one of them could get into this booth [the witness chair]. The other one we could not pry into this booth. And I hate to sound as though we were trying to force the child, but we had everybody in place to try to encourage this child.
We modeled for this child to try to desensitize her to the horror of talking about this incident in this room. And she  one of them was unable to do it totally, and the other one would just sit here but would not answer questions. And these children were very distressed just by an attempt to approximate the situation.
In Dr. Herzog's professional opinion, it would be damaging to the girls if they were to have to testify that they witnessed their father murder their mother. As such, the circuit court determined that the girls qualified as unavailable witnesses pursuant to M.R.E. 804(a)(6).
¶ 18. On July 18, 2003, the circuit court conducted the hearsay portion of the hearing. The State sought to introduce the girls' statements through the testimony of the Jackson police officers. Following proffered testimony and argument, the circuit court held that the girls' statements to various Jackson police officers would be admissible under M.R.E. 803(2)-the "excited utterances" exception to the hearsay rule.
¶ 19. Trial on the matter began on February 9, 2004. The State called Officer Jones, Detective Roberts, Paul Trussell, Jr., Director of Human Resources at the University of Mississippi Medical Center where Charity was employed, Cephis Hogsett, who testified that he saw Bell in the vicinity of Charity's house the night she was murdered, Officer Keys, Lakeeta McGee, a longtime friend of Charity's, Detective Taylor, Rozerrio Camel, and Dr. *957 Steven Hayne, an expert witness certified in anatomic pathology, clinical pathology, forensic pathology, and forensic medicine.
¶ 20. Dr. Hayne performed Charity's autopsy. Dr. Hayne found that Charity suffered twelve stab wounds. Eleven of those stab wounds were clustered within a space of three inches on the left side of Charity's chest. Based on the precise clustering of those eleven wounds, Dr. Hayne opined that the stab wounds were inflicted in rapid succession. The twelfth stab wound was to Charity's neck. Dr. Hayne also found scrapes, scratches, and bruises on Charity's neck, consistent with injuries from being choked.
¶ 21. Dr. Hayne initially thought the stab wound to Charity's neck was the cause of death, but after an internal examination, Dr. Hayne concluded that the cause of Charity's death was two of the stab wounds to Charity's chest. Those two stab wounds went "through the chest wall, cutting the cartilage of the chest wall, not the bone tissue of the rib. And as the instrument entered the chest cavity it actually plunged into the heart, producing extensive bleeding from two stab wounds of the heart." The State rested after Dr. Hayne testified.
¶ 22. During his case-in-chief, Bell called Sergeant Green, Tonya Chandler  who testified that she frequently saw a male at Charity's house and that the male she saw was not Bell. Andre Harris, Bell's first cousin, Brad Bell, Bell's brother who corroborated Bell's alibi, and finally, Bell himself took the stand.
¶ 23. Bell testified that he lived with his mother and his brother. Further, Bell testified that, on the day before Charity was found murdered, he went to his grandmother's house around 7:30 p.m. and only stayed about five minutes. He got back to his house around 8:15 p.m. He watched a movie and fell asleep. He did not wake up until his mother got back from a trip to Michigan. He then left his house around 10:15 p.m. to take some shoes to someone named Shantay at the corner of Watkins and Forest Avenue. He left Shantay's house and stopped at a Chevron and bought a beer. Then he went back to his house around 10:45 or 11:00 p.m. He did not leave his house the rest of the night.
¶ 24. The next morning, he took another one of his children to school. He then went to his grandmother's house around 8:15 a.m. He had been there thirty or forty minutes when he found out about Charity. He did not say who told him about Charity, though on cross-examination he testified that, around 8:40 a.m., "Peaches called Kenny and Kenny told me." By Bell's testimony, he heard about Charity's murder before Officer Jones, the first responder at the scene, received the call from dispatch. When he heard about Charity, Bell drove to Charity's house, walked up to Officer Keys, and asked Officer Keys if it was true that Charity was dead. Bell adamantly denied that he killed Charity. Bell rested after he concluded his testimony.
¶ 25. On rebuttal, the State called Dr. Herzog. Dr. Herzog testified about her professional relationship with Adrienne and Ashley. Additionally, Dr. Herzog testified as to Adrienne's and Ashley's statements regarding the fact that Bell killed Charity.
¶ 26. Following deliberations, the jury convicted Bell for murder. Posttrial, Bell filed combined motions for a new trial or, alternatively, for a judgment notwithstanding the verdict. The circuit court denied both of Bell's posttrial motions. Bell appeals.

ANALYSIS

I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT *958 HELD THE UNAVAILABILITY HEARING IN BELL'S ABSENCE.
¶ 27. This issue stems from Bell's absence at the pre-trial unavailability hearing. Bell claims that, because he was absent from the unavailability hearing, we should find reversible error. According to Bell, his absence at the unavailability hearing amounted to a violation of his right to confront witnesses against him. Additionally, Bell cites Chase v. State, 699 So.2d 521 (Miss.1997) and its holding that "a criminal defendant is guaranteed the right to be present at any stage of the criminal proceedings that is critical to the outcome if his presence would contribute to the fairness of the procedure." Id. at 537 (internal quotations omitted).
¶ 28. The State cites Mack v. State, 650 So.2d 1289 (Miss.1994) and argues that, pursuant to Mack, Bell had no constitutional right to be at a hearing that dealt solely with legal issues and, were he present, Bell would not have contributed to the fairness of the procedure. Id. at 1307. Further, the State submits that Bell suffered no prejudice as a result of his absence. We agree.
¶ 29. From the record, it is clear that the trial judge was cognizant of Bell's rights. The trial judge, sua sponte, rescheduled the hearing regarding whether hearsay evidence of Adrienne's and Ashley's statements would be admissible through the police officers and detectives who interviewed them. What is more, the trial judge only heard argument and testimony regarding whether Adrienne and Ashley would be "unavailable" to testify within the strict legal meaning of the term. That entailed consideration of whether it would be harmful to Adrienne and Ashley if they were to testify in the presence of Bell, their father. The issue hinged solely on Dr. Herzog's testimony and her professional opinion. In the context of that hearing, focused solely on the legal determination of the girls' "unavailability," Bell would have had no means to contribute to the fairness of the procedures involved in the unavailability hearing. Bell suffered no prejudice due to his failure to attend that hearing  his attorney vigorously cross-examined Dr. Herzog, examined Dr. Herzog's qualifications, and objected to Dr. Herzog's testimony. We find no merit to Bell's first contention.

II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING BELL HIS FEDERAL AND STATE CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM.
¶ 30. In this issue, Bell claims that the circuit court denied him his right to confront the witnesses against him  in particular, his daughters. According to Bell, when the officers testified under the excited utterances exception because Adrienne and Ashley were legally "unavailable," he had no prior opportunity to cross-examine them or otherwise confront his accusers. Bell submits that reversible error is the result.
¶ 31. The admission of testimonial evidence is within the sound discretion of the trial court, which will be found in error only if the ruling was an abuse of discretion. Lynch v. State, 877 So.2d 1254, 1281(¶ 86) (Miss.2004). The trial court must exercise its discretion within the confines of the rules of evidence. Austin v. State, 784 So.2d 186, 193(¶ 23) (Miss.2001). Any error in the admission or exclusion of evidence is not grounds for reversal unless the error adversely affected a substantial right of a party. Lynch, 877 So.2d at 1281(¶ 86).
¶ 32. As discussed, neither Adrienne nor Ashley testified at trial because they were found "unavailable" pursuant to *959 M.R.E. 804(a)(6). Rule 804(a)(6) states that a child witness is "unavailable" to testify if there is a "substantial likelihood that the emotional or psychological health of the witness would be substantially impaired if the child had to testify in the physical presence of the accused." Since they were unavailable, and the State had no direct evidence of Bell's guilt, the State sought to introduce Adrienne's and Ashley's statements through other witnesses. Still, the State had to circumvent the hearsay rule to introduce the girls' testimony.
¶ 33. Under Rule 801(c) of the Mississippi Rules of Evidence, "[h]earsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." (internal quotations omitted). "Hearsay is not admissible except as provided by law." M.R.E. 802. At the hearing on the matter, the circuit court held that Adrienne's and Ashley's hearsay statements were admissible according to the "excited utterance" exception in M.R.E 803. Under the "excited utterance" exception, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. M.R.E. 803(2). We mention this for discussion purposes only, as the outcome of this analysis does not depend on whether or not Adrienne's and Ashley's statements were proper excited utterances.[1] Rather, our analysis depends on whether Adrienne's and Ashley's statements were "testimonial."
¶ 34. Bell's trial began on February 9, 2004. On February 12, 2004, the jury found Bell guilty of murder. The United States Supreme Court handed Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) down on March 8, 2004  nearly a month after Bell's conviction. Thus, at the time of Bell's conviction, Crawford had not yet been decided. Bell filed his notice of appeal on March 9, 2004.
¶ 35. We must determine whether we should apply Crawford retroactively. Presently, there is no definitive answer or precedent in Mississippi regarding the retroactive application of Crawford to direct appeals, such as this one, or to collateral appeals. The United States Supreme Court has held that "a new rule for the conduct of criminal prosecutions that is grounded in the United States Constitution applies retroactively to all cases, state or federal, pending on direct review or not yet final." Powell v. Nevada, 511 U.S. 79, 84, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994) (quoting Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). In People v. Martinez, 348 Ill. App.3d 521, 284 Ill.Dec. 546, 810 N.E.2d 199, 211 (2004), the Illinois Court of Appeals held that Crawford applies retroactively to cases pending on direct review at the time the rule in Crawford was declared. The Michigan Court of Appeals reached the same result in People v. McPherson, 263 Mich.App. 124, 687 N.W.2d 370, 377 fn. 10 (Mich.App.2004). In Clark v. State, 891 So.2d 136(¶ 32) (Miss.2005), our supreme court did not discuss the retroactive effect of Crawford, yet the Clark court analyzed the substantive issue and found harmless error. The Clark court's application of Crawford further suggests that Crawford applies retroactively *960 to cases on direct appeal. Applying the precedent in Powell and Clark, as well as the determinations from the foreign state courts, we find that Crawford applies retroactively to direct appeals in Mississippi.[2] We turn to the substance of the issue on appeal.
¶ 36. In Crawford, the United States Supreme Court held that "the Confrontation Clause of the Federal Constitution's Sixth Amendment bars the admissibility of out-of-court testimonial statements by an unavailable witness offered in a criminal trial to prove the truth of a matter asserted (also known as hearsay) unless the defendant has had a prior opportunity to cross-examine the witness about the statement." Frazier v. State, 907 So.2d 985(¶ 36) (Miss.Ct.App. 2005). As a result, "testimonial hearsay must be exposed to confrontation by way of cross-examination prior to reaching admissible status, while non-testimonial hearsay does not trigger the need for confrontation to be admissible." Id. at (¶ 39). "Thus, our application of Crawford to the present facts depends upon a determination of whether the evidence admitted is `testimonial.'" Id. Crawford declined to provide a firm definition of "testimonial" evidence. Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Even so, Crawford did provide examples of "testimonial" evidence. Id. According to Crawford, prior testimony at a preliminary hearing, before a grand jury, or at a former trial and prior testimony during police interrogations, are all examples of "testimonial" evidence. Id.
¶ 37. While not directly on point to the present matter, in Elkins v. State, 918 So.2d 828 (Miss.Ct.App.2005), the defendant argued that, pursuant to Crawford, a trial court violated his right to confront the witnesses against him when it allowed a witness to testify under the tender years exception. Id. at (¶ 11). This Court held that Crawford did not apply to the facts in Elkins because the hearsay declarant testified at trial and was subject to cross-examination. Id. at (¶ 12).
¶ 38. Here, the facts relating to the hearsay analysis are undisputed. Adrienne and Ashley were legally unavailable to testify during trial. Numerous police officers testified as to what Adrienne and Ashley said to them on the morning that Charity was found murdered. Those police officers went to Charity's house only after Mr. Thompson reported finding Charity murdered. Adrienne and Ashley gave their statements as a result of questions asked by police officers. The police officers asked those questions with the intent to surmise the events surrounding Charity's murder. The act of questioning, sometimes termed "interrogation," was in the strict context of the investigation. There can be no doubt that the girls' hearsay statements, offered through other witnesses because the girls were unavailable, qualifies as prior testimony made during police interrogations. Likewise, there can be no doubt that Bell never had the opportunity to cross-examine his daughters and he could not do so through cross-examination of the police officers following their hearsay testimony gleaned from police interrogations. Therefore, Bell had no opportunity to cross-examine the witnesses against him. Such evidence is one of the few specific examples of prohibited evidence mentioned in Crawford. Thus, we are of the opinion that the hearsay testimony at issue resulted in a violation of Bell's constitutional rights. The State produced no other eyewitness testimony *961 of the violent death of Charity. Bell gave no confession and testified before the jury that he did not commit the murder. Admission of this constitutionally prohibited hearsay can hardly be viewed as harmless error. Accordingly, we reverse Bell's conviction and remand to the circuit court for a new trial consistent with this opinion.
¶ 39. Because we feel reversal is constitutionally required and that the remaining issues, as framed, are unlikely to reoccur during retrial, we find it unnecessary and unwise to address those moot issues.
¶ 40. THE JUDGMENT OF THE FIRST JUDICIAL DISTRICT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] Although we have serious questions and concerns regarding whether the girls' statements, offered in response to police questions at the scene of the crime, in the front seat of a police car, or at police headquarters, properly qualify as "excited utterances," resolution of that issue is unnecessary because the trial judge had previously held that Adrienne and Ashley were unavailable under M.R.E. 804(a)(6).
[2] Our resolution of the retroactive application of Crawford to direct appeals is in no way determinative as to the retroactive application of Crawford to collateral appeals.