# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00858-COA

**RYAN SCOTT PERRIGIN A/K/A RYAN PERRIGIN**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

DATE OF JUDGMENT:                05/27/2021
TRIAL JUDGE:                     HON. LEE J. HOWARD
COURT FROM WHICH APPEALED:       LOWNDES COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:         MARK ANDREW CLIETT
                                 RHONDA R. HAYES-ELLIS
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: SCOTT STUART
DISTRICT ATTORNEY:               SCOTT WINSTON COLOM
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 01/10/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A defendant was indicted for two counts of sexual battery of a person less than fourteen years old. The testimony at trial was that he met a little girl at his daughter's birthday party. On two separate occasions after the party, he sexually assaulted the child. After hearing from the victim and both the defendant's children, a jury found him guilty. Finding no reversible error, we affirm.

## FACTS

¶2.     One summer, one of Ryan Perrigin's children was having a birthday party at his girlfriend's house. At the party were two of Perrigin's other children, Bella and Carl. Bella

was twelve and Carl was fifteen. Bella's friend Anna was also twelve and came with her friend to the birthday party.[1] Perrigin was forty years old.

¶3.   The children all went swimming along with Perrigin. At some point during the party, Perrigin commented on Anna's belly-button ring, saying he thought it was "sexy."

¶4.   Over the course of the night, Perrigin took all three kids with him to his mother's house. There, he gave his children Bella and Carl a marijuana blunt. Perrigin then took Anna upstairs.

¶5.   According to Anna, after they smoked marijuana together, "[w]e took a shower, and we had sex." When she was later asked what physically took place between the twelve-year-old and forty-year-old, Anna said, "He put his penis in my vagina." Perrigin sexually assaulted Anna a second time the same day.

¶6.   This was not the only time Perrigin and Anna were alone. Sometime later after the birthday party, Perrigin took his son Carl with him to Anna's grandfather's house, where the girl was staying. Perrigin asked his teenage son if he wanted to participate in what Carl called "a threesome" with the twelve-year-old girl. Feeling "grossed out," Carl refused and left and waited in the bathroom.

¶7.   But he saw what happened. "I peeped through the door to see if they were done, but they weren't done, and so I closed the door," Carl would later say.

---

[1] We do not use the names of minors in this sexual battery case, and the names of Anna, Bella, and Carl are pseudonyms to shield their identities.

¶8.     As summer ended and school began, Carl told his school counselor he knew his father had sexually assaulted Anna.  Concerned, the school counselor reached out to Anna to confirm if what Carl said was true.  Anna told her it was, and the authorities were alerted.

¶9.     Perrigin was ultimately indicted for two counts of the sexual battery of "[a] child under the age of fourteen (14) years of age, if the person is twenty-four (24) or more months older than the child."  Miss. Code Ann. § 97-3-95(1)(d).

## PROCEDURAL HISTORY

¶10.     Both of Perrigin's children and the victim testified against him during trial.  Anna told the jury about the times she had been assaulted by Perrigin.  Bella corroborated key points from Anna's story; first, that Perrigin had commented on her friend's belly-button ring; second, that Perrigin had taken the children to his mother's house; third, that he provided marijuana to the three kids; and last, that he had gone off alone with Anna.  Carl recounted that he had seen his father attack Anna.

¶11.     The jury next heard from the school counselor, who corroborated that Carl had come to her in distress complaining that he was not getting along with his father, and proceeded to say that his dad had sexually assaulted Anna.  On cross-examination, Carl admitted that he had been diagnosed as bipolar and took medication to treat it.  "I can act out on my medicine," he conceded.

¶12.     The school counselor and investigator explained what next happened as they learned about the allegations regarding Perrigin.  In particular, the counselor said Anna "stated to me

3

that Ryan Perrigin had on several occasions had given her weed and also ecstasy pills and at that point had sex with her."

¶13.    Perrigin's theory of the case was set out in his lawyer's opening statement. At its core was that the victim could not be trusted and that Perrigin did not have the opportunity to commit the crimes of which he was charged. In part it was that Perrigin's son Carl had "devised a plan . . . to get back at his father" for being disciplined. The defense called two witnesses to develop this theory and dispute the charges.

¶14.    The first was Latasha Ponder, the defendant's wife. After a nine-year relationship, the two married nineteen days before the trial. She testified that Anna had not been originally invited to the birthday party, but arrived with Bella. She explained her husband had indeed said "in his opinion belly button rings are sexy." However, he had only said that to her, she explained, and not directly to the victim. She did concede the whole group was outside, and "[e]verybody on the deck heard the conversation."

¶15.    Latasha elaborated that the home they were in—an older manufactured one— basically had no privacy, as there were no doors to the bedrooms. She said the girls took the main bedroom while she slept in the living room and Perrigin went to work, and would have heard if anyone had left. On cross-examination, she agreed she was surprised to find out her now-husband had been using marijuana with the children. She had not believed it at first because she had never seen him use drugs. She did not believe Perrigin had used drugs with the victim or that he had attacked her.

4

¶16. Latasha's mother, Brenda Langford, was Perrigin's other witness. Brenda lived next door to her daughter and testified that Perrigin had been kind to her and helped her with her medications. The first time she met the victim was at the birthday party. She did not witness anything inappropriate from Perrigin directed toward Anna and never heard anything either. However, Langford admitted her memory was not perfect, and she could not recall if her husband was still alive at the time of the alleged assault.

¶17. The jury convicted Perrigin on both counts, and he was sentenced as a habitual offender, due to prior convictions, to serve consecutive terms of twenty-five years in custody.

## DISCUSSION

¶18. On appeal, Perrigin urges three arguments warrant reversal. First, he argues the weight of evidence is not enough to sustain the conviction. Second, he claims his lawyer was ineffective in representing him at trial. Last, Perrigin protests that prior statements by Anna were improperly introduced through the testimony of the school resource officer and the investigator in violation of his right to confront her at trial.

### I. The verdict was not against the weight of the evidence.

¶19. Perrigin ultimately argues the verdict was against the weight of the evidence because the testimony of Anna, Bella, and Carl "was inconsistent." Perrigin further hones in on Carl as being an "unreliable witness" because he has bipolar disorder.

¶20. "A challenge to the weight of the evidence is separate and distinct from a challenge to the legal sufficiency of the evidence" in that it seeks a new trial. *Thomas v. State*, 48 So.

3d 460, 469 (¶20) (Miss. 2010). A jury verdict on appeal will be disturbed only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Jones v. State*, 154 So. 3d 872, 880 (¶24) (Miss. 2014). The evidence is viewed in the light most favorable to the verdict. *Bradford v. State*, 102 So. 3d 312, 316 (¶16) (Miss. Ct. App. 2012).

¶21. During the trial, the jury heard from all three children—Anna, the victim; Bella, Perrigin's daughter; and Carl, Perrigin's son. Sarah Hendricks, who was Carl's school counselor, also testified. She explained how Carl told her how his father had sexually assaulted Anna. Hendricks then contacted Anna to ask her if the story was true, and the child confirmed it. "She told me that he made her have sex with him," Hendricks testified. And the school resource officer testified he was notified a student had been sexually assaulted.

¶22. Perrigin's core theory of the case was to cast doubt on Carl's testimony—that he was on medication for bipolar disorder and had been mad at his father. This thrust the credibility of the witnesses before the jury, and in our system "[a] jury resolves matters of weight and credibility." *Dehart v. State*, 290 So. 3d 373, 376 (¶20) (Miss. Ct. App. 2020).

¶23. The jury heard from not only the victim and two of Perrigin's own children, but the jury also heard their testimony corroborated by the school resource officer. The jury heard that Carl had approached her of his own volition and told her that his father had sexually assaulted Anna; independent of that, she then reached out to the victim and checked with her to see if what Carl said was true. Anna told her that it was. It was in the province of the jury

6

to determine if these witnesses were credible, and that is exactly what the jury did in this case. As such, the verdict was not against the weight of the evidence.

## II. We decline to review the ineffective-assistance-of-counsel claims.

¶24. Perrigin argues there were two failures by his trial counsel which constituted ineffective assistance of counsel. First, he argues that she should have objected to allowing the three children to testify about their drug use with Perrigin; and second, that trial counsel failed to explore the sexual history of the victim at trial.

¶25. Ineffective-assistance-of-counsel claims should ordinarily be raised in a petition for post-conviction relief, not on direct appeal. *Hamlin v. State*, 306 So. 3d 843, 844 (¶2) (Miss. Ct. App. 2020). "The Court will address such claims on direct appeal when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate, and the appellate court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id.* "This Court has also resolved ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020).

¶26. The State did not stipulate that the record is adequate to consider the ineffective-assistance claim. Because the record does not affirmatively show ineffective assistance of counsel rising to the level of a constitutional violation, and because the parties did not stipulate that the record is adequate to determine whether Perrigin received

7

ineffective assistance from his trial attorney, we decline to review this claim, and it may be raised in a motion for post-conviction relief with the Supreme Court's permission. *See* Miss. Code Ann. § 99-39-7 (Rev. 2020) (requiring motion seeking PCR to be filed in the Supreme Court "[w]here the conviction and sentence have been affirmed on appeal").

### III.  The Confrontation Clause was not violated.

¶27.    Perrigin argues Anna's prior statements should not have been allowed to come in through the testimony of the school counselor and a deputy.

¶28.    "[T]he confrontation clause is violated when a hearsay declarant is available to testify at the trial, *but does not do so*, and the defendant lacked an opportunity to cross-examine the declarant on a prior occasion." *Elkins v. State*, 918 So. 2d 828, 832 (¶12) (Miss. Ct. App. 2005) (emphasis added). That case centered on a conviction for fondling a child, specifically the appellant's stepchild. *Id*. at 830 (¶¶3-4). She testified at trial and her social worker also "testified extensively at the trial regarding her interview with" the victim. *Id*. at 831 (¶6).

¶29.    Nonetheless, Elkins claimed his right to confront the witness had been infringed due to the statements brought in by the social worker. *Id*. at 832 (¶9). We declined to find error since the minor victim "testified at the trial and Elkins cross-examined her." *Id*. at (¶12). Therefore we found the defendant's "right to confront [his accuser] was preserved despite the admission of [her] statements during the testimony of [the social worker]." *Id.*

¶30.    We reached the same conclusion in a case decided the next year, where another defendant was convicted of child fondling. *Penny v. State*, 960 So. 2d 533, 536 (¶1) (Miss.

Ct. App. 2006). The defendant claimed his right to confront was violated when a prior videotaped statement of the victim was played. *Id*. Yet as in *Elkins*, the victim had testified, "and Penny's counsel was allowed both cross-examination and recross-examination" of her, including after the tape was played. *Id*. at 537 (¶11). We found there was no violation. *Id*. at 538 (¶16).

¶31. The same year we reversed a criminal conviction of a murder when the witnesses were unavailable. *Bell v. State*, 928 So. 2d 951, 959 (¶30) (Miss. Ct. App. 2006). Bell argued that because the witnesses—his daughters—were unavailable, "he had no prior opportunity to cross-examine them or otherwise confront his accusers." *Id*.

¶32. We found that neither witness testified because they were deemed unavailable in accordance with Mississippi Rule of Evidence 804(a)(6). *Bell*, 928 So. 2d at 959 (¶30). And, "[s]ince they were unavailable, and the State had no direct evidence of Bell's guilt, the State sought to introduce [their] statements through other witnesses." *Id*. But to do this, the State had to rely on hearsay, and as a result, we held that "there can be no doubt that Bell never had the opportunity to cross-examine his daughters and he could not do so through cross-examination of the police officers following their hearsay testimony gleaned from police interrogations." *Id*. at (¶38). Because Bell was denied his constitutional right to cross-examine his accusers, we reversed and remanded for a new trial. *Id*. at 961 (¶39)

¶33. This case mirrors *Elkins* and *Penny*, and stands as the opposite of *Bell*. Like the witnesses in the first two cases, the victim here actually testified during Perrigin's trial and

9

was subject to cross-examination. While Perrigin protests the school counselor testified to things Anna did not say at trial, the counselor's testimony was based upon her prior interview with the girl, which is the exact situation that occurred in *Elkins*. Anna took the stand and was extensively questioned by defense counsel regarding her alleged drug use and whether this ultimately impacted her credibility. In *Bell*, the daughters did not testify at all; that is simply not the case here.

¶34. Because Anna testified in this case and was subject to cross-examination, we find that Perrigin was not denied his right to confront his accuser.

## CONCLUSION

¶35. For the reasons set out above, the convictions and sentences are **AFFIRMED**.

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**